Argued and submitted January 15, affirmed July 15, 1998

Bobbette SANDERSON,
*Appellant,*

*v.*

Susan L. MARK, M.D.,
*Respondent,*

*and*

PACIFIC COMMUNITIES HOSPITAL,
a public body, Douglas J. Kimmel, M.D.,
Marcus P. Johnson, M.D.,
*Defendants.*

(960080; CA A94887)

962 P2d 786

Jeffrey B. Wihtol argued the cause for appellant. On the briefs were Kathryn H. Clarke and Maureen Leonard.

Janet M. Schroer argued the cause for respondent. With her on the brief were Marjorie A. Speirs and Hoffman, Hart & Wagner.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

**HASELTON, J.**

Plaintiff appeals from an adverse judgment, following a jury trial, in a medical malpractice action arising out of defendant's[1] alleged misdiagnosis and related failure to treat plaintiff's breast cancer. Plaintiff assigns error, *inter alia*, to the trial court's evidentiary rulings that culminated in the exclusion of the testimony of plaintiff's expert witness, Dr. James Gallant. We conclude that, on the totality of the record, any error in the predicate rulings and in the ultimate exclusion of Gallant's testimony was harmless. Plaintiff's other assignments of error lack merit. Accordingly, we affirm.

The parties strongly dispute issues of breach of the standard of care and causation. However, except as expressly noted, the material historic facts that underlie those disputes are largely undisputed. In May 1992, plaintiff, who was then 59 years old, first consulted defendant, a board-certified internist practicing in Newport. Plaintiff had recently moved to Oregon from California, where she had been treated by Kaiser Hospital physicians. Before her first appointment with defendant, plaintiff completed a four-page personal history questionnaire and checked "yes" to the question, "Have you had any discharge from your nipples?" Defendant then conducted a complete physical examination, which included taking an oral history from plaintiff, in which plaintiff stated that her mother had died of breast cancer. Defendant also noted that plaintiff had "chronic eczematous changes of the left nipple with fibrocystic changes in both breasts." Defendant referred plaintiff to Dr. Douglas Kimmel, a radiologist, for a mammogram. The referral form listed only "hormone repl[acement] therapy" under "diagnosis/symptoms." Kimmel performed the mammogram and, in interpreting the results, identified "fibrous stroma" and "benign appearing stromal calcifications."[2] Defendant reviewed Kimmel's

---

[1] "Defendant" in this opinion refers solely to Susan L. Mark, M. D. Other individuals and entities were parties to the action but were dismissed before trial.

[2] "Stroma" means "[t]he framework, usually of connective tissue, of an organ, gland, or other structure; distinguished from the * * * specific substance of the part." *Stedman's Medical Dictionary*, 1348 (23rd ed 1976). "Calcification" means "[a] process in which tissue or noncellular material in the body becomes hardened

report, noting on it that it "looks OK," and did not refer plaintiff for further evaluation or treatment.

Plaintiff visited defendant for unrelated problems on October 15, 1992, and February 17, 1993, and the condition of plaintiff's left breast was not discussed at either of those appointments. On April 15, 1993, plaintiff visited defendant for an annual physical. Defendant made the following chart note entry: "BREASTS: Reveal no dominant masses but induration [3] and tenderness over the left nipple and diffuse fibrocystic changes." Under the heading "ASSESSMENT AND PLAN," defendant wrote:

"3) The nipple change is fairly chronic and may just be eczematous. She is due for a mammogram and we will need to consider referral to Dr. Ryan for biopsy of this area. She will be returning in 3 weeks for recheck on this and discussion of her mammogram."

Defendant referred plaintiff to Dr. Marcus Johnson, a radiologist, for the mammogram. The parties dispute whether defendant told plaintiff to return in three weeks for further discussion of the condition of her left breast.

The referral form to Johnson listed only "fibrocystic br[east] dis[ease]" under "diagnosis/symptoms." Johnson interpreted the mammogram as follows:

"Patient has a somewhat asymmetric fibrotic benign appearing breast pattern. There is again noted to be some subareolar fibrotic density on the left greater than the right which has a somewhat stellate appearance. If the patient has any suspicious lesion of the left areolar area further evaluation clinically is suggested. * * * The patient has developed linear and punctate calcifications which appear to be along the course of a vessel in the left periareolar region superolaterally for which I do not think follow-up is necessary. No other changes occurred.

"CONCLUSION: No significant change. See discussion above."

---

as the result of precipitates or larger deposits of insoluble salts of calcium[.]" *Id.* at 210.

[3] "Induration" means "[t]he process of becoming extremely firm or hard, or having such physical features." *Stedman's Medical Dictionary* at 703.

Defendant reviewed that report, again noting on it only that it "looks OK."

Plaintiff testified that, after the April 1993 mammogram, she received a call from defendant's nurse informing her that her mammogram looked "okay." According to plaintiff, the nurse did not tell her that she needed to come in for further discussion of her condition or have a biopsy. Defendant's nurse testified that, although she did not remember the conversation with plaintiff, her normal procedure was always to give patients the information defendant had written on the radiologist's report and sometimes to read the radiologist's conclusion, but not the entire report, to patients.

Defendant next returned to see plaintiff 10 months later, on February 15, 1994, complaining of an unrelated problem. The condition of plaintiff's left breast was not discussed at that appointment. On February 22, 1994, plaintiff visited defendant for an annual physical. Following that visit, defendant noted "pronounced thickening and eczema in the area of the left nipple with some inversion of the nipple." Under a chart entry denominated "Assessment and Plan," defendant noted:

> "I am very concerned about the changes in the left breast contrary to her assertion. This is a definite change from her previous exam. After her mammogram last year she did not return for the reevaluation and discussion that had been scheduled. But at this point, referral is definitely indicated."

Defendant referred plaintiff to Dr. Ryan, a general surgeon, who recommended and performed a biopsy on March 1, 1994. The pathology report on the biopsy indicated "findings [that] are characteristic of an invasive ductal carcinoma of the breast[.]" On March 16, 1994, Ryan performed a mastectomy of plaintiff's left breast. Ryan started plaintiff on tamoxifen hormone therapy.

On May 24, 1994, plaintiff began seeing Dr. Norek, an oncologist in Corvallis, for cancer treatment. After tests revealed that the cancer had metastasized to other parts of plaintiff's body, including her spine, Norek classified

patient's breast cancer at Stage IV.[4] Norek recommended, and plaintiff underwent, radiation therapy and continuation of tamoxifen. Although plaintiff's response to treatment was very good, curing a patient with plaintiff's symptoms is highly unlikely and, in plaintiff's circumstances, therapy is directed at controlling her disease as long as possible and giving her the best possible quality of life.

In January 1995, plaintiff filed a complaint against Kaiser Foundation Hospitals[5] and defendant, alleging that, as a result of their negligence, diagnosis of plaintiff's breast cancer was delayed past the time when she could be cured. In March 1995, plaintiff amended her complaint to add as defendants Drs. Kimmel and Johnson, the radiologists who interpreted her 1992 and 1993 mammograms, and Pacific Communities Hospital, their employer. Thereafter, and before trial, plaintiff entered into stipulated judgments of dismissal with Kaiser, Kimmel, Johnson, and Pacific Communities Hospital.

In July 1996, plaintiff filed a third amended complaint against defendant only. That complaint, on which the case was tried, alleged that defendant had been negligent in three particulars:

"(A)   In failing to diagnose the cancer in plaintiff's left breast until in or about March of 1994; and

"(B)   In failing to recommend and/or refer plaintiff for a biopsy of her left breast until in or about March of 1994; and

"(C)   In failing to communicate to defendants Pacific Communities Hospital, Kimmel, and Johnson the history and clinical findings of the left nipple area in connection with the mammograms of 1992 and 1993."

The case was tried to a jury over 10 days in July and August 1996. Plaintiff presented the testimony of nine expert

---

[1] Physicians assign a "stage" to a patient's breast cancer based on a number of factors, including the metastatic involvement of areas of the body other than that where the primary cancer is located. Generally, a lower stage indicates a better prognosis, while a higher stage indicates a poorer prognosis. Stage IV is the highest stage.

[5] Kaiser, which provided plaintiff's medical care in California from 1984 through 1991, was later dismissed from the case.

witnesses, six of whom rendered opinions that defendant had breached the "standard of care"[6] with respect to her conduct underlying each of the three specifications of negligence and two of whom rendered opinions that, because of those breaches, plaintiff's life expectancy had been substantially shortened.[7] *See* 155 Or App at 178-82 (describing testimony more fully). Conversely, defendant presented the testimony of five expert witnesses, controverting the testimony of plaintiff's experts. The jury returned a general verdict for defendant.

On appeal, plaintiff raises four assignments of error: (1) The trial court erred in denying plaintiff's motion *in limine* to exclude references to plaintiff's claims against the defendants—*i.e.*, Kaiser Foundation Hospitals, Kimmel, Johnson, and the Pacific Communities Hospital—who had been previously dismissed. (2) The court erred in denying plaintiff's *in limine* motion to preclude defense counsel from cross-examining one of plaintiff's expert witnesses, Dr. Gallant, about matters before the Oregon Board of Medical Examiners (BME) in which defense counsel's law firm was representing Gallant. (3) The court erred in subsequently excluding Gallant's testimony. (4) The court erroneously ruled that plaintiff's claim for loss of future income must be reduced by projected future personal consumption.[8]

---

[6] The proper area of inquiry for an expert witness is not "standard of care," a legal concept, but, rather, "knowledge of the methods of customary and proper medical treatment in that or a similar community." *Creasey v. Hogan*, 292 Or 154, 166, 637 P2d 114 (1981); *see also Mosley v. Owens*, 108 Or App 685, 690, 816 P2d 1198, *rev den* 312 Or 527 (1991).

[7] Plaintiff's ninth expert witness was an economist.

[8] In general, the dispute over the measure of recovery concerned whether plaintiff's recovery for loss of future pension income should be a "gross" or a "net" recovery. The former corresponds to the measure commonly employed in personal injury cases; the latter approximates the measure of recovery in wrongful death cases. *See, e.g., Meier v. Bray*, 256 Or 613, 614, 475 P2d 587 (1970).

Although this is not a wrongful death case, the gravamen of plaintiff's complaint is that her life expectancy has been dramatically shortened as a result of defendant's alleged negligence. Some courts have held that, in such "shortened life expectancy" cases, the "gross" measure of recovery applies—*i.e.*, the recovery for future loss of income should not be reduced for projected personal consumption. *See, e.g., Burke v. United States,* 605 F Supp 981, 989-90 (D Md 1985).

No Oregon appellate opinion has ever addressed that issue. Given our disposition of plaintiff's other assignments, we do not address the propriety of the trial court's endorsement of a "net" approach.

As amplified below, we reject the first assignment of error and conclude that any error pertaining to the second and third assignments was harmless. That disposition obviates consideration of the fourth assignment of error.

Plaintiff asserts that the trial court erred in denying her *in limine* motion to preclude references to her claims against the dismissed defendants, because such references were irrelevant and, in all events, were more prejudicial than probative. Defendant responds, in part, that, whatever the putative merits of the court's ruling, plaintiff's counsel "opened the door" for such references to Kimmel, Johnson and Pacific Communities Hospital. For the reasons that follow, we agree with defendant.

█ Before trial, plaintiff moved to exclude any "mention of the existence or resolution of any claim by plaintiff against any defendant dismissed from this case." Plaintiff argued that such information was irrelevant, but, even if it were relevant, its probative value would be outweighed by the danger of unfair prejudice, confusion of the jury, and tendency to prolong the trial by the introduction of collateral issues. OEC 401; OEC 403. Defendant contended that prior pleadings were relevant, in that they stated, inconsistently with the third amended complaint, that plaintiff's disease began years before her treatment with defendant began. The trial court denied the motion:

> "I'm going to rule that the prior pleadings are admissible. I'm not going to balance; it's rebuttable, and plaintiff may do what they [*sic*] choose to rebut any matter brought up by the filing against Kaiser or any of the other parties that are outside the context of this case at this time."

Defense counsel then stated:

> "[T]he contention that the cancer existed at the time of the Kaiser treatment is something that will be on the table from the beginning, in light of your ruling. Whether or not it is tactically appropriate for me to comment on these other claims [*i.e.*, against Kimmel, Johnson, and Pacific Communities Hospital], I don't know, until I hear their opening and hear their case.
>
> "* * * * *

"[A]t this point the malpractice claims against Kimmel, Johnson and [Pacific Communities Hospital], *I don't intend to mention those claims unless I believe that [plaintiff's] Counsel raises that issue, and I will then raise it in court. I'm certainly not going to in opening statement in front of the jury without further discussion.*"

(Emphasis supplied.)

Thereafter, in opening statement, *plaintiff's* counsel stated:

"This case originally * * * included Kaiser of Northern California * * *. Mrs. Sanderson had been a patient of Kaiser for years before coming here to Newport and establishing care with Dr. Mark in 1992. Kaiser was originally included because of the fear of the statute of limitation, as well (inaudible) the lawsuit might not be (inaudible) but as investigation was undertaken (inaudible) no claim against Kaiser (inaudible) cancer, because Kaiser was not at fault.

"And as the case proceeded there was concern about the radiologist[s] who had done the mammogram here in Newport at Pacific Communities Hospital. And they were defendants in this case as well. And when it became apparent through the work-up on the case, the fault truly laid with Dr. Mark. * * * And she's now the sole remaining defendant in this case."

Given that sequence—defense counsel's statement that, despite having prevailed against the *in limine* motion, he would not mention the claims against Kimmel, Johnson, and Pacific Communities Hospital unless plaintiff's counsel did so first, and plaintiff's counsel's election, notwithstanding defense counsel's pledge, to refer to those dismissed defendants in opening statement—plaintiff's counsel "opened the door" and, effectively, waived any objection to the *in limine* ruling. As defendant observes on appeal, "having made a tactical decision not to wait to see if defendant would go into this matter, and instead taking the more aggressive 'preemptive strike' approach, plaintiff cannot now be heard to complain * * *." *Cf. State ex rel Juv. Dept. v. Cook*, 325 Or 1, 932 P2d

547 (1997) (holding that party's choice to testify about substance of statements that he had earlier sought to have suppressed eliminated possibility that denial of motion to suppress harmed him); *State v. Lopez*, 147 Or App 314, 318, 936 P2d 386, *rev den* 326 Or 58 (1997) (same).

■ The corollary to that conclusion is that, whatever the merits of the *in limine* ruling as applied to the other dismissed defendant, Kaiser, any error in that respect was harmless. Plaintiff identifies no prejudice flowing from the references to Kaiser that was distinct from that allegedly resulting from the references to Kimmel, Johnson, and Pacific Communities Hospital.[9] Consequently, we reject that assignment of error.

We address together the two assignments of error pertaining to the testimony of Gallant. Two or three months before trial, in May or June 1996, plaintiff retained Gallant, a Corvallis internist, as an expert witness. At that time, the BME had begun an investigation concerning Gallant, and Gallant had retained Portland attorney Robert Wagner to represent him in that matter. Robert Wagner and defendant's trial counsel, Mark Wagner, are both members of the law firm of Hoffman, Hart & Wagner. Robert Wagner was, apparently, unaware that Gallant had been retained as an expert in this matter, and Mark Wagner was unaware of his firm's ongoing representation of Gallant before the BME. Plaintiff's counsel, Jeffrey Wihtol, was aware of Hoffman, Hart & Wagner's representation of Gallant.

At the time that plaintiff retained Gallant, the BME's investigation was "inactive" and, because the BME had not issued a complaint, the matter was confidential. In late July, approximately one week before trial, the BME filed its complaint, making the matter public.[10] At the beginning of plaintiff's case-in-chief, before calling Gallant as plaintiff's first witness, plaintiff's counsel moved *in limine* as follows:

---

[9] For example, plaintiff points to defense counsel's three references in closing argument to plaintiff suing Kimmel and Johnson for "three-and-a-half million bucks" as exemplifying the inflammatory effect of references to the dismissed defendants.

[10] The only reference to the subject of the BME proceedings was an allusion by counsel to "euthanasia."

"Plaintiff's first witness is Dr. Gallant. Dr. Gallant has been a client of [defendant's counsel's] law firm * * *. And additionally, Dr. Gallant has recently received some press regarding some preliminary activities in the Board of Medical Examiners * * * involving a patient's death in Corvallis. And we would move *in limine* to preclude any mention of anything involving extraneous legal matters that Dr. Gallant may be involved in that are not pertinent to this case, and any mention whatsoever of anything to do with the patient's death in Corvallis or preliminary proceedings before the Board of Medical Examiners. Those matters have absolutely no relevance to this case."

Defense counsel, after stating "this is absolutely hitting me cold," expressed concerns about possible ethical problems arising out of his firm's representation of Gallant and requested an OEC 104 hearing to ascertain the nature of Gallant's testimony and to explore those concerns. After Gallant testified pursuant to OEC 104(3), defendant moved to disqualify Gallant as a witness "because of the appearance of impropriety that it creates and the potential of a mistrial that it creates":

"I'm concerned about the appearance of things in cross-examining the firm's client, especially when this—if this were a situation where he'd been a long-standing family doctor and was kind of a captive witness, that would be one thing. But he's selected at a time when he's a current client of the office and everybody knows who the players are, and it creates an unnecessary problem.

"* * * * *

"And I—you know, this has nothing to do with the merits or the demerits of the BME complaint, and that probably won't even be mentioned, that's not really the point. The point is, we're going to be making an official record where this gentleman will be on record under oath, and the record may come back to haunt him for other reasons in other proceedings. And it would come in through questions of an attorney in his own firm. I just find that unseemly and uncomfortable. That's my concern."

Plaintiff's counsel responded that the BME matter was "completely extraneous" to any proper subject of cross-examination and, consequently, if plaintiff's *in limine* motion

were granted, any ethical concerns would be obviated. After hearing arguments from the parties, the trial court ruled, "I think it creates a potential conflict and * * * [t]he doctor will not be authorized to testify period."

Plaintiff then made an offer of proof. Gallant testified that he is a physician specializing in internal medicine in Corvallis. Gallant rendered an opinion that defendant had breached the standard of care with respect to each of the three specifications of negligence. Of particular significance to our review and our assessment of defendant's "harmless error" argument, Gallant testified that many medical professionals—internists, family practitioners, general practitioners, nurse practitioners, physician's assistants, nurses—perform breast examinations, and that the principles and practices for conducting such exams and standard of care for breast exams is the same "irrespective of the medical provider involved." Gallant further testified that the standard of care required defendant, at the 1992 physical, to be aware that plaintiff had indicated that she had had nipple discharge, to ask plaintiff about it, and to make a chart note of plaintiff's response. Gallant further testified that, according to defendant's deposition testimony, defendant stated that sometimes five days could elapse between a patient visit and defendant's dictation of chart notes for that patient and that, soon after transcription, her handwritten notes were discarded. Gallant testified that that lapse in time between seeing patients, dictating chart notes, and reviewing the chart notes for accuracy "increases the risk of error" in chart notes. Gallant did not, however, identify a generally accepted practice as to the recording of chart notes—*i.e.*, a maximum acceptable time between an examination and dictating chart notes—much less testify that defendant had violated such accepted practice.

At the conclusion of the offer of proof, plaintiff asked the trial court to reconsider its ruling. The trial court declined, stating:

"I do it on a broad, general basis and not specifically, that there is a potential for ethical conflict and that I think this could have been resolved pretrial; it was not. * * * [T]he general ethical questions of counsel for the defense * * *

representing [defendant] * * * in this case and his law firm for representing the doctor who is potentially being called to testify * * * it's the basis for this Court excluding it."

Plaintiff then presented her case, which included testimony from nine medical expert witnesses: (1) Susan Schenk, M.S.N., a certified nurse practitioner who practices with the internal medicine clinic at Oregon Health Sciences University (OHSU) in Portland; (2) Clinton Sayler, M.D., a radiologist who, before to his retirement in 1995, practiced at Good Samaritan Hospital in Portland; (3) Harry Moore, M.D., a general practitioner who practices in Albany; (4) Cynthia Ferrier, M.D., a board-certified internist who practices at Providence Hospital in Portland; (5) Kathleen Folk, M.S.N., a nurse practitioner who practices with the Internal Medicine Division at OHSU; (6) Rodney Pommier, M.D., a general and oncology surgeon associated with OHSU's Multi-Disciplinary Breast Clinic; (7) Robert Craven, M.D., a board-certified radiologist who practices in Portland; (8) Michael Lagois, M.D., a board-certified clinical and anatomical pathologist who is medical director of the breast cancer consultation service at St. Mary's Medical Center in San Francisco; and (9) David Newman, M.S.N., a nurse practitioner who practices with the Department of Family Medicine at OHSU. Plaintiff asked six of those nine experts—Schenk, Moore, Ferrier, Folk, Craven, and Newman—questions about whether defendant had breached the standard of care in treating plaintiff, and all six responded that she had. Defendant countered with a similarly imposing array of experts.

On appeal, plaintiff reiterates that her motion *in limine* should have been granted and that the allowance of that motion would have eliminated the "potential for ethical conflict" that underlay the court's preclusion of Gallant's testimony. Defendant disputes those assertions and asserts that, in all events, any error by the trial court did not affect any "substantial right" of the plaintiff. OEC 103(1); ORS 19.415(2). In asserting "harmless error," defendant emphasizes that plaintiff presented extensive testimony of medical experts other than Gallant and invokes the principle that erroneous exclusion of evidence will be deemed harmless if the finder of fact otherwise receives substantially the same

evidence that was presented in the offer of proof. *See, e.g., Sneath v. Phys. and Surg. Hospital*, 247 Or 593, 599, 431 P2d 835 (1967) (exclusion of testimony of microbiologist was harmless where jury heard substantially similar testimony from two physicians); *Bremner v. Charles*, 123 Or App 95, 104, 859 P2d 1148 (1993), *rev den* 318 Or 381 (1994) (stating principle).

■ Based on our review of the trial record, and particularly the testimony of plaintiff's other medical witnesses, we conclude that, even assuming that the trial court erred in precluding Gallant's testimony, that error was not reversible error. An extended comparison of Gallant's putative testimony with the testimony of plaintiff's other experts would serve little purpose. However, we do specifically address, and reject, plaintiff's contention that Gallant was a unique witness whose testimony on two issues—the standard of care for an internist in a small-to-medium-sized Oregon town and practice pertaining to chart notes—was essentially irreplaceable.

Plaintiff first contends it is likely that any error in excluding Gallant's testimony was prejudicial because Gallant's practice and specialty were most like those of defendant:

"Dr. Gallant was that rare and difficult witness for plaintiffs in medical negligence cases, particularly those tried outside the metropolitan area: a physician with a similar practice, in a similar and nearby community. By statute, codifying a well-accepted common law principle, [defendant's] conduct is to be judged by the standard of medical practice 'in the same or similar community.' ORS 677.095. Only two other physicians were critical of [defendant's] care: one who practiced in a different specialty, and one from Portland. While scholars and professionals may believe, and plaintiff's attorneys may urge, that the relevant 'community' is a national one, jurors hearing these words may well interpret them more narrowly, taking a more parochial view which is often encouraged by defense counsel in medical negligence actions * * *."

(Footnote omitted.) Plaintiff further contended that Dr. Moore, one of those two physician witnesses, "fizzled" on the stand, testifying that defendant did meet the standard of care

with respect to the 1992 physical. Because of that shortfall in Moore's testimony, plaintiff asserts, Gallant was the sole "same or similar community" witness who would have provided unequivocal testimony that defendant breached the standard of care.

The short answer to plaintiff's argument is that each of plaintiff's medical experts, including Gallant, *and defendant's expert witnesses*,[11] agreed that there was a uniform (*i.e.*, non-"local" standard) "standard of care." *Accord Mosley v. Owens*, 108 Or App 685, 691, 816 P2d 1198, *rev den* 312 Or 527 (1991) ("Oregon's 'locality rule' does not preclude the possibility that certain standards of care are uniform throughout the nation."). No one disputed the uniformity of the "standard of care." Accordingly, Gallant's "local" testimony in that regard would merely have reiterated what was uncontroverted.

Nor was Gallant's putative testimony that defendant breached the standard of care with respect to all three specifications of negligence qualitatively different from testimony plaintiff adduced from her other witnesses. Six of plaintiff's nine medical experts offered an opinion as to whether defendant had breached the standard of care; each testified that she had. Of those six, one—Moore—did acknowledge on cross-examination that he believed that defendant met the standard of care as to the 1992 physical. However, even without Moore's testimony, plaintiff presented unqualified testimony from five medical experts that defendant had breached the standard of care. The addition of Gallant's testimony to the same effect is not likely to have made any difference. *See Sneath*, 247 Or at 599.

Plaintiff alternatively contends that exclusion of Gallant's testimony was prejudicial because Gallant was the only physician expert who would have testified about deficiencies in defendant's charting method. The only reference to charting in Gallant's offer of proof was as follows:

---

[11] Except for defendant's own testimony, the defense did not present testimony from an internal medicine specialist in a similarly sized community.

"Q. [By plaintiff's counsel.] Dr. Gallant, did you review Dr. Mark's description in her deposition of her method of preparing the typewritten chart notes for her patients?

"A. Yes.

"Q. Does Dr. Mark dictate her chart notes concurrently with the patient visit?

"A. No, it was stated at times it could be up to five days from the visit to the dictation, and that the handwritten notes were discarded.

"Q. Do you recall from Dr. Mark's deposition whether Dr. Mark had her handwritten notes of the patient visit available to her at the time that the typewritten notes came back from the transcriptionist?

"A. She did not, according to the testimony, have any handwritten notes available at the time the transcription notes were returned.

"Q. And, Dr. Gallant, based on your education and training and experience in caring for patients over the years, do time lapses between seeing the patient, dictating the chart notes, and then reviewing the chart notes for accuracy, create increased possibility for error in chart notes?

"A. Each one of those increases the risk of error."

Significantly, Gallant did not identify a standard for the acceptable time period between the patient's examination and dictating chart notes, much less testify that defendant had, in fact, breached such a standard with respect to plaintiff.

After the exclusion of Gallant's testimony, plaintiff presented expert chart note testimony through Schenk, a certified nurse practitioner, who testified that she had reviewed defendant's deposition in which defendant stated that she sometimes waited up to five days before dictating chart notes and that that, in Schenk's opinion, was not "consistent with the standard of care." Defense counsel did not cross-examine Schenk on that "standard of care" testimony. Defendant subsequently testified that, at the relevant time, her practice was to dictate chart notes at the end of the day or the first thing the next morning, although sometimes it was a day or

two later, and that it was unlikely that she waited five days to dictate plaintiff's chart notes.

Given that juxtaposition of proof, the exclusion of Gallant's incidental, and largely inconclusive, references to charting practices, ultimately did not prejudice plaintiff. Gallant did not render an opinion that defendant's alleged standard practice, much less her particular conduct with respect to keeping plaintiff's chart notes, was improper. Rather, he merely stated the unexceptional proposition that the greater the delay between observation and recordation, the greater the risk of imperfect recollection. Conversely, Schenk went far beyond that "risk of error" truism and explicitly testified that defendant's alleged general charting practices violated the standard of care. Any error in precluding Gallant's testimony was harmless.

Affirmed.