Argued and submitted June 19, 2008, reversed and remanded February 11, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT KENNETH JOHNSON,
*Defendant-Appellant.*

Curry County Circuit Court
05CR0954; A131641

202 P3d 225

Wayne Mackson argued the cause and filed the brief for appellant.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Defendant was convicted of harassment, ORS 166.065; assault in the fourth degree, ORS 163.160(1)(a); menacing, ORS 163.190; pointing a firearm at another, ORS 166.190; and unlawful use of a weapon, ORS 166.220. He now appeals, advancing five assignments of error concerning the admissibility of various items of evidence and the adequacy of the trial court's jury instructions. Specifically, in his first two assignments of error on appeal, he argues that the trial court erred in excluding tape recordings of 9-1-1 calls that he made the day before and the morning of the incident that led to his convictions. In his third and fourth assignments, he argues that the trial court erred in excluding testimony of a physician and closing argument of counsel relating to his physical condition. In his fifth assignment, he argues that the trial court erred in refusing to give a "choice of evils" jury instruction.

We reject without discussion defendant's first, second, and fifth assignments of error. The state concedes that the trial court erred as asserted in defendant's third and fourth assignments, but argues that the error was harmless. We agree that the trial court erred, but disagree that the error was harmless. Accordingly, we reverse and remand.

Because a jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. McDonnell*, 313 Or 478, 480, 837 P2d 941 (1992). We begin with an overview of the facts leading to the charges against defendant and address in more detail the evidence in dispute in our analysis of the relevant assignments of error.

Defendant and the victim had known each other for a number of years, having worked together in California. In July 2005, when defendant was 62 years old and the victim was 50 years old, the victim visited defendant at defendant's residence in Oregon. The victim initially stayed for a month, during which he helped defendant with a construction project; he refused any pay for his work. The victim returned in August 2005 and began living in a yurt on defendant's property. Beginning in September 2005, defendant agreed to keep track of the hours that the victim worked for him and to pay

him $10 an hour. That same month, defendant agreed to buy a camper for the victim and allow him to "work it off."

On September 15, the two men argued about the terms of their work arrangement. The victim attempted to leave the property with the camper. Defendant blocked the victim's access to the camper, and the victim left without it. Defendant called the sheriff's office; the deputies who responded to the call ascertained that no one was injured and advised defendant that the dispute was a civil matter. Later that evening, the victim called defendant and, according to defendant, made threatening statements. Defendant told the victim to stay off his property.

The next day, the victim again contacted defendant to discuss their disagreement. After that discussion, defendant called the sheriff's office and inquired whether the victim could be arrested for trespassing if he came onto defendant's property.

On September 17, the victim called defendant to tell him that he was coming to get the money that he claimed defendant owed him. When the victim arrived at defendant's property, defendant was waiting outside the gate. Defendant told the victim that he was going to get the victim's money and told the victim to wait outside the gate. Defendant then drove back onto his property, accompanied by another person, Warnken, who had arrived after the victim. After about 10 minutes, the victim decided to walk onto the property as well, to see whether he had left anything in the camper. The victim encountered defendant, who told him to get off the property. The victim continued walking toward the camper; when he reached it, he discovered that it was locked. When the victim returned to where defendant was standing, defendant pulled out a gun, told the victim he was making a citizen's arrest for trespassing, and told the victim to lie on the ground. When the victim refused to comply, defendant fired a shot past the victim's head, called 9-1-1, and then hit the victim with the gun. The victim got into Warnken's vehicle, and he and Warnken drove away. Along the road, they encountered sheriff's deputies and made a statement. The deputies continued to defendant's property, where they arrested defendant.

Defendant was charged with the previously stated crimes and was convicted. At trial, defendant offered the testimony of his physician, Williams, relating to defendant's physical condition. The trial court excluded the testimony. In closing argument, defendant attempted to argue that the jury should consider defendant's physical condition in determining whether the state had disproved defendant's affirmative defenses of self-defense, defense of premises, and/or the justifiable use of force in making a citizen's arrest. The trial court, however, ruled that defendant could not make that argument.

■　　On appeal, defendant challenges both rulings. Defendant points to *State v. Wright*, 310 Or 430, 436, 799 P2d 642 (1990), in which the Supreme Court held that, for the purpose of the defenses at issue in this case, whether the degree of force employed by a defendant is excessive or disproportionate is a question for the jury to be answered from the standpoint of a reasonable person in the situation of the defendant "under all the circumstances surrounding him." According to defendant, Williams's testimony—which would have included testimony that he had been defendant's physician for five to 10 years; that defendant has had a cervical fusion and multiple low back surgeries; that defendant had severe congestive heart failure, hypertension, and coronary artery disease; and that defendant was one of Williams's most fragile patients—pertained to such circumstances and therefore was logically relevant to his defenses. In addition, defendant asserts, Williams's expert testimony was qualitatively different from testimony that defendant himself was able to offer. According to defendant, Williams's testimony was "the only evidence that could have objectively established the true state of defendant's physical condition."

As noted, the state concedes that the trial court erred in excluding the evidence and, concomitantly, in precluding counsel from making an argument based on it. We agree. *See* ORS 161.209 (person is justified in using physical force for self-defense or defense of others from what the person reasonably believes to be the use or imminent use of unlawful physical force; person may use degree of force that the person reasonably believes to be necessary); *cf. State v. Doherty*, 52 Or 591, 596, 98 P 152 (1908) (in determining

whether a defendant's use of force in his defense was justified, jury may consider the "relative age and strength of the parties" as well as the ferocity of the attack). The state argues, however, that the error was harmless. According to the state, it was undisputed at trial that defendant's physical condition was poor and defendant's counsel argued as much to the jury.

■■     We will affirm a judgment of conviction notwithstanding the erroneous admission or exclusion of evidence if there is little likelihood that the error affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). We first determine the issue to which our harmless error analysis applies. *State v. Ennis*, 212 Or App 240, 262, 158 P3d 510, *rev den*, 343 Or 223 (2007). We then asses the erroneously admitted or excluded evidence in light of other evidence in the record pertaining to that issue. If erroneously admitted or excluded evidence relates to a "central factual issue" in the case, it is more likely to have affected the jury's determination than if it deals with a tangential issue. *State v. Marrington*, 335 Or 555, 566, 73 P3d 911 (2003). By contrast, if the particular issue to which the error pertains has little relationship to the issues being determined by the jury, then there is less likelihood that the error affected the verdict. *Id.*

Davis is illustrative. In that case, the defendant was charged with murder. At trial, he sought to introduce evidence of the victim's statements to various persons regarding her depressed and suicidal mental state, in support of his defense theory that the victim killed herself. The trial court excluded the statements, which had been made between one and three years before the victim's death, as being "too old." The defendant subsequently was convicted by a jury. 336 Or at 21-25.

On appeal, the Supreme Court concluded that exclusion of the statements was error. *Id.* at 25-27. It then considered whether the error was harmless in light of other testimony relating to the victim's mental state, including testimony by two witnesses regarding the victim's grief over the death of her child one month before the victim's own death, and the testimony of a doctor who had conducted a post-mortem evaluation of the victim's medical records and

concluded that the victim was depressed but not suicidal. *Id.* at 33-34.

The Supreme Court first determined that the excluded statements were not "merely cumulative" of the admitted evidence, because they contained more specific threats of suicide and thus were "qualitatively different" from the evidence the jury heard. *Id.* at 34. The court also determined that the more remote statements tended to show the persistence of the victim's depressed and suicidal mental state. *Id.* Finally, the court determined that the excluded statements went "directly to the heart of defendant's factual theory of the case" and "tended to complete the picture of defendant's version of the events." *Id.* For those reasons, the court could not say that there was little likelihood that exclusion of the statements affected the jury's verdict. *Id.* at 34-35.

*State v. Smith*, 154 Or App 37, 960 P2d 877 (1998), also is instructive. In that case, the defendant was an inmate in a minimum security correctional facility; the perimeter of the grounds was marked with signs but no fences. After the defendant left the premises and was found in a nearby forest, he was charged with escape in the second degree. He gave notice that he intended to rely on an insanity defense under ORS 161.300; his theory was that he suffered from depression and had no memory of leaving the facility. *Id.* at 39-40. The trial court excluded the testimony of a psychologist as to the defendant's psychological condition. This court determined that the exclusion of the testimony was error and that, moreover, the error was not harmless. We reasoned that the defendant's sole defense at trial was that, at the time he left the camp, he lacked awareness that that was in fact what he was doing and that the psychologist's testimony that he suffered from a mental disorder that could have caused that lack of awareness "went to the heart of" his defense. *Id.* at 50-51. We therefore reversed and remanded for a new trial. *Id.* at 51.

In this case, the disputed issue is whether defendant was justified in using physical force to defend himself. Again, evidence relevant to that issue includes evidence relating to the relative age and strength of defendant and the victim. *Doherty*, 52 Or at 596. We therefore examine the state of the

record as to that issue, noting, as we do so, that the issue was central to defendant's defense of self-defense.

Defendant testified at trial that, starting in December of 2001, he had three back surgeries. The first involved removing two discs from the base of his neck and inserting a tungsten plate and screws to "hold everything in place." He testified that, about a year later, he had a laminectomy in which surgeons "trim[med] the bulge off" a herniated disc in his lower back. Six or seven months later, the disc was removed and, using two metal rods and four bolts, a piece of bone from his hip was inserted; defendant explained that he had degenerative disc disease. At some point after that, defendant was in an accident in which he fractured his right hip and four ribs, punctured a lung, and "cracked [his] head." Defendant testified that he was in a coma for five weeks and that "they think that during that time I had a silent—what they referred to as a silent heart attack," as a result of which a defibrillator was implanted that "monitors my heart."

Defendant testified that, although he did "yard work and stuff like that," he was not supposed to do any hard labor or heavy lifting. When asked whether, due to his back problems, he was "supposed to not have any physical force applied to [his] body," he responded in the affirmative and added, "And possibly a heart attack." He also stated, "I could end up in a wheelchair or die."

On cross-examination, defendant acknowledged that he had studied martial arts for three or four years and that, when he hit the victim, he was attempting to do so according to a martial arts technique. He agreed that, despite his illnesses, he did "get out and try to be active"; that he had helped load 80-pound storage racks into his vehicle; and that he used a cane only at certain times such as when his back was "really bothering me" or he had to climb stairs or stand in a line.

The victim's testimony also touched on defendant's physical condition. The victim testified that he was aware of defendant's "back operations," his defibrillator, and the fact that defendant took "medications." He also testified that he knew that the reason that defendant had hired him to do

physical labor on defendant's property was because defendant could not do the work himself.

We turn to the excluded testimony of defendant's physician. In defendant's offer of proof, Williams testified that he was a medical doctor, that he had a general practice including surgery, and that he was the medical administrator and chief of staff at Curry General Hospital. He estimated that he had been treating defendant for five to 10 years. He noted that defendant had had multiple back surgeries, including a fusion of his cervical spine and lower back surgery, and that, as a result, defendant's spine was "very fragile" and he had to "be very careful." Williams also testified that defendant had "severe" congestive heart failure or congestive cardiomyopathy, leading to the implantation of a biventricular pacemaker and to defendant's inability to walk quickly without becoming short of breath. Williams noted that defendant also has coronary artery disease with significant hardening of the arteries, making him more prone to heart attack. He testified that defendant had "not the greatest lungs in the world," and that he had had some "irregularities of his heartbeat, which would be expected with severe congestive heart failure and hypertension." Williams testified that defendant was "one of my most fragile patients," that he "shouldn't really be involved in anything physical that involves much physical activity," and that, if someone exerted physical force against him, he could not defend himself as would a "normal person of his age." Williams reiterated that defendant had "extremely bad heart failure" and a "bad back" and that, if he experienced "physical force from a third party," he "could probably die" and he "couldn't defend himself for sure physically, and I wouldn't recommend that he be involved in any highly emotionally charged situations." Williams stated that the average person who is defendant's age "is in much better condition than he is." When asked whether defendant knew that, if he were in a physical confrontation, he could be seriously injured or die, Williams answered, "Yes, he does."

Having considered Williams's proffered testimony in light of admitted evidence, we cannot say that the erroneous exclusion of Williams's testimony was harmless. First, Williams gave a more detailed, technical, and complete

description of defendant's condition. For example, although defendant referred to his silent heart attack, the need to monitor his heart, and the possibility that he might have another heart attack, Williams explained that defendant had congestive heart failure or cardiomyopathy, noted that that condition prevented defendant from engaging in certain activities, noted that defendant also had "significant" coronary artery disease or hardening of the arteries, and noted that he had an irregular heartbeat. Williams also testified that defendant had hypertension and impaired lung capacity; defendant did not mention those conditions at all. Thus, Williams's testimony was not merely cumulative of other, admitted evidence; rather, it contained more detailed and scientifically based information about defendant's condition, as well as information that other testimony did not address at all.

Equally significantly, Williams expressed various medical judgments about defendant's condition. He characterized defendant's spine as "very fragile" and opined that defendant's congestive heart failure was "severe" and "extremely bad." As a matter of his medical judgment, Williams also compared defendant's overall condition to that of other persons defendant's age: according to Williams, defendant was one of his "most fragile patients," who could not defend himself as would a "normal person of his age." None of the other evidence about defendant's physical condition came in the form of expert opinion.

Accordingly, this is not a case in which the excluded testimony of one medical expert was "not qualitatively different from" the testimony of another medical expert. *See Sanderson v. Mark*, 155 Or App 166, 179-80, 962 P2d 786 (1998) (even assuming that the trial court erred in excluding testimony of medical expert, error was harmless because that expert's testimony was not qualitatively different from that of at least five other expert witnesses). Rather, here, Williams was the only potential witness who was a medical expert and, consistently with that status, his testimony was significantly more scientific in nature. Stated another way, the source of the erroneously excluded evidence significantly differentiated that evidence from other, admitted evidence—

defendant's and the victim's lay descriptions of defendant's condition.

■     "The potential for scientifically based evidence to exert influence on a jury is manifest." *State v. Aman*, 194 Or App 463, 474, 95 P3d 244 (2004), *rev dismissed*, 339 Or 281 (2005). Thus, ordinarily, when scientifically based testimony by an expert witness is erroneously *admitted*, it weighs against a determination that the error was harmless. *See State v. Keller*, 315 Or 273, 286, 844 P2d 195 (1993) (erroneous admission of physician's testimony was not harmless; witness had "extensive professional experience" in the relevant subject, she testified "in an authoritative and detailed manner about that subject," and her testimony "presumably was persuasive to the trier of fact"); *State v. McFarland*, 221 Or App 567, 578, 191 P3d 754 (2008) ("When the source of erroneously admitted testimony is a witness presented to the jury as an expert on matters that are scientifically based, it weighs heavily against a determination that an error is harmless."); *State v. Norby*, 218 Or App 609, 621, 180 P3d 752 (2008) (erroneously admitted testimony of physician was not harmless; "the source of the erroneously admitted statements figures heavily in our harmless error analysis"). It stands to reason that the erroneous *exclusion* of scientifically based testimony of an expert witness is to similar effect. That is what occurred here. The error was not harmless.

Reversed and remanded.