Argued and submitted June 24, reversed and remanded on Counts 2, 3, 6, 7, and 8; remanded for resentencing; otherwise affirmed October 1; on appellant's petition for reconsideration filed October 15, on respondent's petition for reconsideration filed October 15, reconsideration allowed by opinion November 19, 2014 (267 Or App 121)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## HUNG NGOC TRUONG,
*Defendant-Appellant.*

Multnomah County Circuit Court
110532061; A150936

337 P3d 845

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Erin K. Galli, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Tookey, Presiding Judge, and Hadlock, Judge, and De Muniz, Senior Judge.*

TOOKEY, P. J.

---

* Hadlock, J., *vice* Haselton, C. J.

## TOOKEY, P. J.

Defendant, who sold batteries labeled and packaged as batteries made by the Sony Corporation, appeals a judgment of conviction for one count[1] of trademark counterfeiting in the second degree, Count 2, ORS 647.145,[2] and three counts of trademark counterfeiting in the third degree, Counts 6, 7, and 8, ORS 647.140,[3] and raises six assignments of error. We write to address defendant's first five assignments of error, in which he argues that the trial court improperly admitted testimonial, documentary, and physical evidence regarding Trustgram technology, a technology used by Sony to conduct authentication tests on batteries sold by defendant. He argues that that evidence is scientific evidence that should not have been admitted without the foundational showing of scientific validity required by *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995). The state responds that Trustgram technology is not scientific evidence and that any error was harmless. We review for legal error. *State v. Whitmore*, 257 Or App

---

[1] Defendant was found guilty of an additional count of trademark counterfeiting in the second degree, Count 3, which was merged with Count 2. Defendant was also acquitted of one count of aggravated theft, Count 1, and two additional counts of trademark counterfeiting in the second degree, Counts 4 and 5.

[2] ORS 647.145 provides, in part:

"(1) A person commits the crime of trademark counterfeiting in the second degree if the person:

"(a) Commits trademark counterfeiting as described in ORS 647.135 and:

"(A) Has one prior conviction for trademark counterfeiting in any degree;

"(B) The total number of items bearing the counterfeit mark is more than 100 but less than 1,000; or

"(C) The total retail value of all of the items bearing the counterfeit mark or services that are identified by the counterfeit mark is more than $1,000 but less than $10,000."

[3] ORS 647.140 provides, in part:

"(1) A person commits the crime of trademark counterfeiting in the third degree if the person commits trademark counterfeiting as described in ORS 647.135 and:

"(a) The total number of items bearing the counterfeit mark is not more than 100; or

"(b) The total retail value of all of the items bearing the counterfeit mark or services that are identified by the counterfeit mark is not more than $1,000."

664, 665, 307 P3d 552 (2013). We conclude that evidence regarding Trustgram technology is scientific evidence that should not have been admitted without the required foundational showing of scientific validity. We further conclude that the error was not harmless. Accordingly, we reverse and remand on Counts 2, 3, 6, 7, and 8, remand for resentencing, and otherwise affirm.[4]

Defendant sold various items on eBay, including batteries bearing the name "Sony"—a registered trademark of Sony. To protect against trademark infringement of certain products, Sony places on its packaging a proprietary holographic sticker called a Trustgram, which, when viewed through a device called a Handy Viewer, indicates whether a product is authentic. Bitter, an investigator for Sony Corporate Security, received a tip that defendant might be selling counterfeit Sony batteries. Bitter purchased batteries packaged as Sony batteries from defendant, and she used Trustgram technology to determine that they were counterfeit. Based on information that Bitter provided to the police, the police later seized numerous batteries from defendant's home, and the state charged defendant with trademark counterfeiting.

Before trial, defendant moved to exclude all testimony "that the batteries at issue are counterfeit[.]" He contended that any such testimony was based on the results of a product authentication test using Trustgram technology, that Bitter lacked the training and experience to testify as an expert about Trustgram technology, and that the state was required to show that Bitter's conclusion met the standards of scientific validity set forth in *Brown* and *O'Key*. In his motion, defendant argued:

"The state must prove beyond a reasonable doubt that the items at issue are indeed counterfeit. This conclusion necessitates expert opinion because the differences between a genuine and counterfeit battery would not be apparent to a lay person and an average juror could not be expected to understand the issues involved. According [to]

_____

[4] Our disposition of this case makes it unnecessary for us to address defendant's sixth assignment of error, in which he argues that the trial court erred when it imposed $3,892.00 in restitution.

the state's own witnesses, it would be impossible for [someone] to tell these batteries are counterfeit without the use [of] a hand held device and the 'Trustgram system' to conduct a product authentication test. To conduct the test and be confident in its reliability, one would need specialized training and experience. In addition, for the results of the test to be admitted, it must be demonstrated that the test is accurate. Therefore, the burden falls upon the state to show that Bitter's conclusion is reliable and meets the standard set in *Brown*."

At a hearing on defendant's motion, Allen testified for the defense; he had been involved with the production of goods in Asia and had expertise in "supply chain management." Allen testified that authentic goods can enter the marketplace through alternative channels—the "gray market"—when, for example, manufacturers sell excess goods or persons working in factories take failed batteries "out the back door." Allen had not tested anything with a Handy Viewer and did not know about its reliability. When asked whether the principles underlying Trustgram technology were sound, Allen replied, "I believe the intent is sound. I don't know if they are 100 percent thorough." Allen testified that, in order to determine with 100 percent certainty that a device, such as a battery, is either genuine or counterfeit, he would perform a "destructive breakdown" of the device—that is, he would open it up and examine an internal component that reveals the corporation and date code.

Bitter testified for the state. She testified that she had been trained in the use of the Trustgram sticker and Handy Viewer and that she travels around the country to train others in the use of Trustgram technology. Bitter also testified that there are different ways to determine whether a battery is counterfeit, but she acknowledged that "the Trustgram is really the most important and definitive piece that tells you whether or not something is counterfeit or made by Sony." Bitter did not know who developed Trustgram technology, but she had used it more than 100 times. Although she had not seen any literature on the effectiveness of Trustgram technology, Bitter stated that she knew from personal experience that it was effective and that she believed that it was effective 100 percent

of the time. However, she also testified that, to her knowledge, there was no verification or independent evaluation of whether Trustgram technology was accurate.

Bitter also testified that she was familiar with two documents that described Trustgram technology. The first document was an exhibit, complete with illustrations, describing how to use the Handy Viewer. The second document was an exhibit illustrating how Trustgram technology works. That exhibit employs words, diagrams, and arrows to describe the scientific principles underlying Trustgram technology. The state submitted those exhibits into evidence; because the information described in those exhibits is proprietary, the trial court placed them under seal.

During cross-examination, Bitter was asked whether she was "familiar with the science behind Trustgram[,]" and she replied, "Based on the information I was provided, yes." She was then asked to explain the science behind Trustgram technology, and she proceeded to do so. During that explanation, Bitter described the basic scientific principles underlying Trustgram technology. She also identified one of the materials from which Trustgram technology is made.

The trial court ruled that the state's proffered evidence was not scientific evidence and alternatively ruled that, even if the evidence was scientific evidence, the evidence would be admissible because it was possible to determine its scientific validity. Accordingly, Bitter's testimony about her use of Trustgram technology, the two exhibits, and a Handy Viewer were admitted at trial over defendant's objection. A jury convicted defendant as noted above, and defendant now appeals.

On appeal, defendant contends that the trial court erred in admitting Bitter's testimony about her use of Trustgram technology, the exhibit illustrating how to use the Handy Viewer, the exhibit illustrating how Trustgram technology works, and the Handy Viewer. He argues that evidence regarding Trustgram technology is scientific evidence, that the state did not establish its scientific validity, and that the trial court's error in admitting the evidence was not harmless.

The state does not argue that, even if the evidence is scientific evidence, the state laid an adequate foundation of scientific validity for its admissibility. That position is well-considered given that the evidence that the state submitted did not satisfy the test established by *Brown* and *O'Key*. Instead, the state responds that "[t]he operation of the Trustgram is not scientific evidence." The state first reviews three cases involving scientific evidence: *State v. Marrington*, 335 Or 555, 73 P3d 911 (2003) (expert's testimony that delay in reporting is a predominant feature in child's disclosure of sexual abuse was scientific evidence and therefore subject to the standards for evidentiary admission established in *Brown* and *O'Key*); *State v. Rambo*, 250 Or App 186, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013) (police officer's opinion that the defendant had driven her vehicle while under the influence of a controlled substance was admissible as nonscientific expert opinion evidence); and *State v. Clemens*, 208 Or App 632, 145 P3d 294 (2006), *rev den*, 342 Or 299 (2007) (officer's opinion that statement given by victim was generally consistent with nonchronological reporting patterns of child abuse victims was not scientific evidence). Based on the reasoning in those cases, the state argues that, "whether particular evidence is 'scientific' will depend not only on whether the evidence derives from the application of scientifically-based knowledge, but also on how that evidence is conveyed to the factfinder." Thus, in the state's view, "Bitter's testimony about the Trustgram was not a scientific assertion" because the Trustgram sticker is like a photograph, which is created through a scientific process but does not require any specialized knowledge to view, and Bitter, who had "no particular scientific training or expertise," did not rely on the vocabulary of science to explain how she reached her conclusion that the batteries were counterfeit. The state alternatively argues that any error in admitting evidence regarding Trustgram technology "was harmless given defendant's theory of defense and other evidence submitted to the jury."

The issue in this case is whether evidence regarding Trustgram technology "is scientific evidence and therefore subject to the adequate-foundation requirements established by *Brown* and *O'Key* for the admission of such evidence."

*Whitmore*, 257 Or App at 669. As the Oregon Supreme Court has explained, "[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate." *O'Key*, 321 Or at 291 (footnote omitted). Therefore, a trial court must, "in the absence of a clear case, a case for judicial notice, or a case of *prima facie* legislative recognition," assess the scientific validity of proffered scientific evidence. *Id.* at 293 (footnote omitted). The party offering the scientific evidence at issue "has the burden of establishing that it is scientifically valid." *State v. Perry*, 347 Or 110, 122, 218 P3d 95 (2009). Because, as we note above, the state did not establish an adequate foundation of scientific validity in this case, if evidence regarding Trustgram technology is scientific evidence, we must conclude that the trial court erred in admitting it.

"Oregon's courts have never precisely defined what makes evidence 'scientific.'" *Whitmore*, 257 Or App at 669. However, the Oregon Supreme Court has observed that "[t]he term 'scientific' *** refers to evidence that draws its convincing force from some principle of science, mathematics and the like." *Brown*, 297 Or at 407. Thus, the court has concluded that Horizontal Gaze Nystagmus (HGN) test evidence is scientific evidence "because science, rather than common knowledge, provides the legitimacy for HGN testing." *O'Key*, 321 Or at 296-97. In so concluding, the court observed that the "value of HGN testing depends critically on the demonstrated scientific validity of" the proposition that the consumption of alcohol has a particular effect on eye movement. *Id.*

The Oregon Supreme Court has also emphasized that whether expert testimony is scientific evidence "depends primarily on whether the trier of fact will perceive the evidence as such." *Marrington*, 335 Or at 561. As the court has explained,

"[t]he value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should

be supported by the appropriate scientific validation. This approach ensures that expert testimony does not enjoy the persuasive appeal of science without subjecting its propositions to the verification processes of science."

*O'Key*, 321 Or at 291-92 (internal quotation marks omitted). Accordingly, "the key question in determining whether proffered testimony is scientific, and thus requires a special foundation, is whether the expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions." *Rambo*, 250 Or App at 193 (internal quotation marks omitted).

We reiterate that Trustgram technology is proprietary and that certain evidence regarding Trustgram technology has been placed under seal. Therefore, we do not present a published description of Trustgram technology or the scientific principles underlying the results that it generates. Beyond what we have already described, we also do not specifically describe Trustgram technology's components or applications, or how the technology works.

Instead, we consider the nature of Trustgram technology by highlighting three points. First, Trustgram technology involves the interaction of two components—a Trustgram holographic sticker and a Handy Viewer. Second, the Trustgram components operate according to certain scientific principles to generate specific test results—whether a particular product is authentic or counterfeit. Third, Trustgram technology requires training to operate—that is, test authentication results are reported by persons who have been trained to use Trustgram technology. Indeed, Bitter testified that she travels around the country training others how to use Trustgram technology. Thus, it appears that Trustgram technology, unlike a photograph, "draws its convincing force from a scientific principle[.]" *State v. Branch*, 243 Or App 309, 315, 259 P3d 103, *rev den*, 351 Or 216 (2011) (concluding that evidence generated by light detection and ranging (lidar) device was scientific because it was "based on the premise that measurements of distance can be derived through the lidar device's use of a certain scientific principle, *viz.*, the speed of light").

Based on the foregoing, we conclude that the testimonial, documentary, and physical evidence regarding Trustgram technology is scientific evidence—that is, evidence that "draws its convincing force from a scientific principle and would be more persuasive to the trier of fact due to its scientific nature." *Id.* The value of the test authentication results generated by Trustgram technology depends critically on the scientific validity of the principles underlying Trustgram technology, and science, rather than common knowledge, provides the legitimacy for the authentication testing by Sony. *See O'Key*, 321 Or at 296. Furthermore, the authentication test results were presented by a witness who used the vocabulary of science to describe Trustgram technology's underlying scientific principles and who authenticated two exhibits, one of which employs words, diagrams, and arrows to describe Trustgram technology's underlying scientific principles. Accordingly, the trial court erred in admitting evidence regarding Trustgram technology without the foundational showing of scientific validity required by *Brown* and *O'Key*.

Because we conclude that the trial court erred in admitting evidence regarding Trustgram technology, we must determine whether that error was harmless. When evidence has been erroneously admitted in a criminal case, we will affirm a judgment of conviction only "if there is little likelihood that the error affected the verdict." *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009) (citing *State v. Davis,* 336 Or 19, 32, 77 P3d 1111 (2003)). We first determine the particular issue to which our harmlessness analysis applies. *Id.* We then assess the erroneously admitted evidence "in light of other evidence in the record pertaining to that issue." *Id.* If the erroneously admitted evidence relates to a central factual issue in the case, rather than to a tangential issue, that evidence is more likely to have affected the jury's determination. *Id.* (internal quotation marks omitted). We consider "any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue." *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). Specifically, we consider whether the factfinder would have regarded the erroneously admitted "evidence as duplicative,

cumulative, or unhelpful in its deliberations." *Whitmore*, 257 Or App at 672-73. Because the "potential for scientifically based evidence to exert influence on a jury is manifest[,]" the erroneous admission of scientifically based evidence ordinarily "weighs against a determination that the error was harmless." *Johnson*, 225 Or App at 555 (internal quotation marks omitted).

As a first step, we determine the particular issue to which our harmlessness analysis applies. To prove defendant guilty of trademark counterfeiting, the state was required to prove, among other things, that (1) the batteries sold by defendant *bore counterfeit marks* and (2) defendant *knew* that those batteries bore counterfeit marks.[5] Defendant argues that the issue to which our harmlessness analysis applies is whether the batteries sold by defendant *bore counterfeit marks*. He points out that he presented a theory of defense, through the testimony of Allen, "that the batteries could have been genuine, but from the gray market." He then argues that evidence regarding Trustgram technology "undermined that defense" because it "permitted the state to show—with 100 percent accuracy—that defendant's batteries were counterfeit" and allowed the jury to "even conduct its own [trademark counterfeiting] investigation during its deliberations" by using a Handy Viewer. In the state's

---

[5] As noted, a person commits the crime of trademark counterfeiting in the second or third degree if the person commits trademark counterfeiting "as described in ORS 647.135[.]" ORS 647.145; ORS 647.140. ORS 647.135 provides:

"(1) A person commits trademark counterfeiting if the person knowingly and with the intent to sell or distribute and without the consent of the registrant uses, displays, advertises, distributes, offers for sale, sells or possesses any item that bears a counterfeit of a mark or any service that is identified by a counterfeit of a mark registered under this chapter or registered under this chapter or registered under 15 U.S.C. 1052 with knowledge that the mark is counterfeit.

"(2) For purposes of this section, a mark is counterfeit if:

"(a) It is a mark that is identical to or substantially indistinguishable from a registered mark; and

"(b) It is used on or in connection with the same type of goods or services for which the genuine mark is registered.

"(3) A person does not commit trademark counterfeiting if the person has adopted and lawfully used the same or a confusingly similar mark in the rendition of like services or the manufacture of like goods in this state from a date before the effective date of registration of the service mark or trademark and continues to use the mark after the effective date of registration."

view, the issue to which our harmlessness analysis applies is whether defendant *knew* that the batteries bore counterfeit marks. According to the state, defendant's "theory of defense was that he did not *know* that the trademarks were counterfeit" and, thus, defendant's defense "did not turn on whether the trademark was, in fact, counterfeit."

We agree with defendant that the issue to which our harmlessness analysis applies is whether the batteries sold by defendant *bore counterfeit marks*. As noted above, defendant argued in his motion *in limine* that the state must prove that "the items at issue are indeed counterfeit[,]" and that the state must demonstrate the accuracy of the product authentication tests, on which Bitter's opinion was based. As noted above, at the hearing and at trial, defendant also presented a theory of defense, through the testimony of Allen, that the batteries could have been genuine—that is, that the batteries sold by defendant were not counterfeit.

In light of other evidence pertaining to that issue, we conclude that the trial court's error in admitting evidence regarding Trustgram technology was not harmless. First, the erroneously admitted evidence relates to a central factual issue in the case—whether the batteries sold by defendant bore counterfeit marks—and was crucial and essential to the state's case. Bitter testified that she was "basing [her] decision pretty much entirely upon this Trustgram logo[.]" She also showed the jurors a battery that was defendant's and an authentic Sony battery and then walked past the jurors, demonstrating "how it is that [she] determine[s] whether" a battery is authentic or counterfeit. Two authentic Sony batteries were later admitted into evidence, along with batteries sold by defendant and a Handy Viewer. Thus, as defendant argues, the trial court's error in admitting the evidence may have allowed the jury to "conduct its own [trademark counterfeiting] investigation during its deliberations" in the jury room. Second, although the state argues that "there was sufficient other evidence from which the jury could have found that the trademarks were counterfeit[,]" evidence regarding Trustgram technology is qualitatively different from other evidence adduced at trial; that is, even if it was not the only evidence tending to show that the trademarks were counterfeit, it was the only scientific

evidence presented that the trademarks were counterfeit. Accordingly, the jury would not likely have regarded that "evidence as duplicative, cumulative, or unhelpful in its deliberations." *Whitmore*, 257 Or App at 673. Thus, we cannot say that there is little likelihood that the trial court's error in admitting evidence regarding Trustgram technology affected the jury's verdict.

In sum, we conclude that evidence regarding Trustgram technology is scientific evidence and that the trial court erred in admitting it without the foundational showing of scientific validity required by *Brown* and *O'Key*. We further conclude that the trial court's error was not harmless. Accordingly, we reverse and remand on Counts 2, 3, 6, 7, and 8, remand for resentencing, and otherwise affirm.

Reversed and remanded on Counts 2, 3, 6, 7, and 8; remanded for resentencing; otherwise affirmed.