Argued and submitted March 10, 2015, reversed and remanded July 20, 2016

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## KILEY CHRISTOPHER HUDSON,
*Defendant-Appellant.*

Josephine County Circuit Court
11CR0529; A153860

380 P3d 1025

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## GARRETT, J.

During a street altercation between defendant and his neighbor, Salomon, defendant stabbed Salomon in the back with a knife, which resulted in Salomon's death. Defendant argued at trial that Salomon was choking him from behind and that defendant stabbed him in self-defense. The jury acquitted defendant of murder but convicted him of the lesser-included charge of first-degree manslaughter, ORS 163.118.

On appeal, defendant raises three assignments of error. We reject the second and third assignments without discussion and write only to address the first assignment of error, in which defendant challenges an evidentiary ruling of the trial court that excluded, as irrelevant, certain computer-generated images. According to defendant, those images would have bolstered his theory of self-defense and supported the credibility of a key defense expert witness, which had been attacked by the prosecution. For the reasons explained below, we conclude that the trial court erred in excluding the evidence on relevance grounds. We further conclude that that error was not harmless. Accordingly, we reverse and remand.

Defendant and Salomon lived across the street from each other. They had a verbal encounter one evening after Salomon became upset that defendant's child and his friends had caused a ball to enter Salomon's yard. The next evening, defendant and his family returned home from an outing at approximately 9:00 p.m. As they exited their vehicle, Salomon asked to speak with defendant. Defendant replied that he needed to get his family inside. The two men engaged in a shoving match. Another neighbor, Eggleston, saw the altercation, and, aware of Salomon's poor health, ran over and "tackled [defendant] from behind, and took [defendant] down into the street." During the struggle, Eggleston told defendant to "calm down" because the police had been called. Defendant bit Eggleston's forearm, and Eggleston let him go. Eggleston then went back to his house to put his dog inside. At some point during the altercation, defendant's wife and children went inside their house.

By the time Eggleston returned to the street, between 30 to 45 seconds later, Salomon was lying on the pavement with defendant standing over him. Eggleston saw that Salomon's back was bloodied and that defendant was holding a knife. Salomon made a "gurgling sound." Defendant, whose head was bleeding, walked across the street to his house, returned moments later and said, "I'm going to be arrested."

Officer Moore was the first emergency responder on the scene and saw a group of people standing in the street. He then saw Salomon lying in the street. Moore asked the group what had happened, and several people pointed towards defendant. Moore arrested defendant and signaled to emergency medics that the area was safe to enter. After detecting that Salomon had no pulse, Moore asked defendant where he had put his knife, and Moore found it in a box in defendant's garage. Another officer heard defendant's wife say that her "husband had been strangled."

Defendant was later interviewed at a police station. During that interview, defendant said that his relationship with Salomon had previously been "cordial" and that their verbal altercation became physical when Salomon hit defendant's wife. Defendant described Eggleston as the one who "escalated everything" when he "threw" defendant on the ground and "was choking" defendant. Defendant told police that, when he wrestled free from Eggleston, Salomon "grabbed me from behind and we fell down in the street." He added that Salomon "was choking me and I couldn't get him off."

An autopsy of Salomon was performed by Dr. Olson, who testified to three stab wounds: one in "the right shoulder," one "just to the left of center in the mid-back or upper back," and one "in the back of the thigh, just below the buttock on the right side." Olson testified at trial that one of the back wounds had perforated Salomon's aorta, causing his death.

At trial, the state's theory was that defendant murdered Salomon after feeling "disrespected in front of his wife and son" and the "defendant could not let that go." Defendant's

theory was that Salomon was choking him from behind and that defendant accidently fatally wounded Salomon when defendant tried to force Salomon off by "pok[ing]" him in the shoulder with a knife.

Neither the state nor defendant offered witnesses to the specific acts that caused Salomon's death. Eggleston testified that he did not see what happened between defendant and Salomon during the brief period when Eggleston returned to his house. Defendant offered evidence regarding police interviews, from the night of the stabbing, in which Eggleston told officers that Salomon grabbed defendant from behind after defendant had gotten away from Eggleston.

Defendant testified that, when he freed himself from Eggleston, he was "grabbed again from behind" and "pulled tightly *** [in] another choke hold." Defendant also testified that he did not know at that moment if it was Salomon who had grabbed him. He and the other person "both went down." Defendant explained that, at some point during the struggle, the person's "weight was on top of me, with his arm around my neck and his weight across my shoulders and *** left side." Defendant "got to a point [where he] couldn't breathe" and "was panicking." Defendant took hold of a knife that was clipped to his pants and swung behind him at least two times. He "did not feel the knife hit anything either time" but soon felt the arm around his neck "loosen up." Defendant testified that when he stood back up, he saw that it was Salomon who had tackled him.

The state offered evidence that Salomon, who was 60 years old at the time of his death, was in poor health and that his physical abilities were limited. He had had "numerous surgeries" and used an oxygen tank for "COPD[,]" a condition that "slowed him down in walking and breathing." Dr. Purtzer, Salomon's physician, testified that he did not believe that Salomon had the strength to tackle a man and choke him to death. The state also offered evidence that, by contrast, defendant was a significantly "younger, fitter man."

A major point of contention at trial was whether defendant's account of the stabbing was anatomically possible.

Testifying for the state, Olson, the medical examiner, said that defendant's version was not plausible. Olson testified that defendant's account "requires you twist and turn your hand to get it to go under the scapula and go from this direction out. It just seems very difficult to envision that that's physically possible in that scenario."

During his cross-examination of Olson, defendant offered several computer-generated images depicting ways in which defendant's struggle with Salomon could have occurred consistently with defendant's version of events. Exhibit 509 showed how abrasions to Salomon's left shin could have happened; Exhibits 511 and 513 showed how the stab wound to the back of Salomon's upper leg could have happened; and Exhibits 515 and 516 showed how the stab wounds to Salomon's back could have happened. In particular, Exhibits 515 and 516 were offered to show that defendant could have fatally stabbed Salomon in the back, while lying on the ground with Salomon on top of him, by swinging his right arm over his own right shoulder and over Salomon's back. The exhibits were created by a forensic expert, Knowles, using a computer program called "Poser."

Olson acknowledged that Exhibit 515 "raises the possibility that this might be achievable." Olson had "trouble" with Exhibit 516, explaining that he wondered "if you can turn your arm like that" because it was "an awkward angle" and questioned whether to do so would be "physically possible." When asked whether he thought Exhibit 516 was nonetheless "anatomically[] within the range of possibilities," Olson replied, "[p]erhaps."

The state called forensic expert Dovci to testify regarding, among other things, the reliability of defendant's Poser exhibits. Dovci explained that the Poser software includes an optional setting that limits what the program can render based on the anatomical limitations of the human body, so that "certain joints can't exceed what would be considered to be normal human motion." Dovci further explained that, in his experience, if Poser's anatomical-limitation setting was turned off, the resulting images might include "bumps and projections and twists that are not normal to human anatomy." Dovci then testified that Exhibit

515 displayed "telltale marks" that it had been made without the anatomical-limits setting because certain aspects of the image were "bulging out *** mean[ing] that particular part of the body ha[d] been twisted to a point where it exceeds the normal function of the program." Dovci opined that "a problem with Poser" is that "you can have distortions of reality *** and this appears to me to be one of them."

Dovci also testified that he was familiar with Knowles's work and reputation (the two had formerly worked together), that Knowles's work had grown "sloppy," and that Knowles was motivated by "money." Finally, Dovci testified that Knowles's exhibits offered by defendant were "not created with an interest in accuracy, they're just being put together to demonstrate a point." On cross-examination, defendant asked Dovci whether there "might be perfectly legitimate reasons" to render images in Poser with the anatomical-limits setting turned off. Dovci replied that he could not think of any.

On direct examination by defendant, Knowles acknowledged that he had turned off Poser's anatomical limits in creating Exhibits 515 and 516. Knowles explained:

> "The limits do not accurately reflect the limits of an actual body. For instance, I can reach back and scratch some of my back. The limits on Poser do not allow that, it only goes a certain distance.

> "With limits turned on, the figures can't be made to touch their toes. *** [T]he program has limitations and even with the limits turned off, there's certain limitations, as well."

Knowles also explained that he was given a video of "live people actually performing what [defendant] requested I image in Poser"—another of defendant's exhibits—and he was "unable to duplicate what the video showed by using Poser figures with the [anatomical] limits on."

This appeal concerns what happened next. Defendant asked Knowles to show the jury images depicting how the Poser program would respond to an attempt to depict a human figure scratching its back or touching its toes, with the anatomical limits turned on and off, respectively. The

state objected, arguing that the evidence was irrelevant because no one was "being accused of scratching their back." In a lengthy exchange with the trial court, the state also objected that the evidence was cumulative because Knowles had already testified that Poser's anatomical limits were overly restrictive.

Defendant responded that he wanted to emphasize to the jury that the Poser program cannot "completely explore the limits of human motion without taking the [anatomical] limits off, so there's nothing wrong with it." Defendant noted that "there was an aspersion cast [by the state] that somehow we are trying to mislead the jury with respect to that, I'm entitled to have [Knowles] explain that that's not accurate."

The trial court sent the jury out and asked defendant for an offer of proof:

"THE COURT: I would say that if it's an example of showing that it doesn't show it touches the toes; I think it's irrelevant. It has to be with regard to the types of photos that were actually entered or we're using before it makes any sense to me, okay.

"[DEFENSE COUNSEL]: *** [T]he offer is not that touching toes in and of them self has relevance.

"* * * * *

"It's that the fact that this program won't allow *** the most basic human functions to be explored.

"THE COURT: *** He's testified to that; I don't see any need to have a display again of something that is marginally relevant as to whether it relates to this specific act.

"* * * * *

"[DEFENSE COUNSEL]: Well, Judge, the offer of proof would be that this witness would be able to show to the jury with two images, limits on, limits off, that the program with limits on would not allow an actor to move his arm or shoulder sufficiently to even scratch his back."

Knowles showed the two renderings to the trial court and explained that one image "was the most extreme attempt to make the image touch its back or scratch its back

with the limits on" while the other was "with the limits off, which allowed me to make the figure touch its back."

The state questioned what defendant's renderings "have to do with anything" and argued that "to do something like this is completely out of the realm of the issue. The issue is, can a human do this? He wants him to get up and say, oh, look, I can do this; therefore, the limitations aren't right." Defendant countered that it would help the jury to know that the anatomical-limits setting "simply cannot allow the program to render positions that are consistent with the limits of human motion," so "let's get this business about manipulating the images off the table here now."

The trial court excluded the renderings, explaining, in part:

"From the standpoint of what I see here on this is nothing more than there are certain bodily functions, and I don't mean internal functions, I'm talking about physical functions that this program can't do. And you're showing me touching toes and you're showing me touching their back, okay. Which is one of the things *** that it cannot do. With the implication, I assume, is to show the jury that therefore he had to do this to show what the *** diagrams that are created by the program, and that's his reason for having to turn it off. *** So, what I hear the state saying, and he's used the term relevance, that it's not. What I see is, is does it really pertain to what's happening and what the drawings are— *** on this that are, have already been received, and that you have brought into evidence, as well as the state. Do these have something to do with the program's inability at that point? Which I'm not hearing other than the testimony, and I'm certainly not seeing it *** what you're doing with these two things."

With the jury present, defendant asked Knowles why he turned off the anatomical limits. Knowles testified, "I know from seven years of experience with Poser that the limits don't accurately replicate what a human body can do." Defendant then offered Exhibits 508, 510, and 512, which Knowles had created with the Poser limits turned on. Knowles described them as "not as precise as I would have liked them to match what the autopsy showed, but that's the best I could do." Exhibits 508 and 510 depicted defendant's

account of how he stabbed Salomon in the back, while Exhibit 512 depicted how he stabbed Salomon in the thigh. Knowles also explained that he had turned off the limits to create Exhibits 515 and 516 as "an attempt to replicate the autopsy report" and what was shown in defendant's video exhibit.

Defendant then introduced the video, Exhibit 517, in which human actors re-enact "how [defendant and Salomon] may have come together at some point in this altercation." The video depicts two actors, one of whom has the other in a headlock on the ground, where the actor in a headlock uses a standard 12-inch ruler to demonstrate that it was anatomically possible to reach up and stab the other person in the center of his back. The knife with which Salomon was stabbed was 11.5 inches long when open.

In closing argument, the state contended that "only a guilty man lies over and over and over to establish a self-defense claim." The state also asserted that

"the defense needed something, anything to counter the overwhelming evidence that the defendant did not and could not inflict these wounds consistent[ly] with the lie that he is telling you.

"* * * * *

"So, what do they do? They turn to Gary Knowles. They give him some money and they say give us something. They ordered a product and they got it. And if you look at those computer images, and he paraded them around this courtroom with the aura of accuracy and possibility.

"* * * * *

"* * * They weren't going to fool Jeff Dovci. He saw them and said no way, this isn't right. This program has anatomical limitations; they shut them off. They manipulated the system's parameters to try to fool you. And were it not for Mr. Dovci, we would have never known.

"They weren't going to tell you. They would've put Knowles up on the stand under the guise of an expert and tried to extend the aura of expertise to these doctored photos. Those are the shenanigans of a guilty man. Guilty people design fabricated evidence to try to fool the jury. It's offensive."

The jury acquitted defendant of murder but convicted him of the lesser-included offense of first-degree manslaughter.

On appeal, defendant argues that the trial court erred in excluding the two Poser images of a figure scratching its back, which defendant offered to compare the results with Poser's anatomical limits on and off.

The parties dispute, as a threshold matter, the basis for the trial court's ruling, which bears on our standard of review. Defendant argues that the trial court excluded the evidence as irrelevant, which we review for legal error. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999) ("[W]e must review determinations of relevance for errors of law."). The state insists that "the fairest reading" of the trial court's ruling is that it was a discretionary exclusion of the evidence as cumulative under OEC 403, which we review for an abuse of discretion. *Id.* The state alternatively argues that defendant's evidence was irrelevant.

A review of the record leads us to conclude that the trial court's ruling was based on its conclusion that the evidence was irrelevant. We readily agree that the state, at trial, objected to defendant's exhibits as both irrelevant *and* cumulative. However, the balance of the state's argument went to persuading the trial court that the exhibits were irrelevant, and the trial court's discussion focused on relevance. As the trial court explained, "what I hear the state saying, and he's used the term relevance, that it's not." The trial court then questioned whether the exhibits "really pertain to what's happening" and whether "these have something to do with the program's inability at that point." The trial court further explained that "I'm certainly not seeing it * * * what you're doing with these two things." Based on that colloquy, the fairest reading is that, in the trial court's view, the evidence lacked probative value. As noted, we review that conclusion for legal error.

The threshold for relevance is low. "[E]vidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or

210, 238, 986 P2d 5 (1999); *see also* OEC 401. Moreover, to "have probative value, evidence does not need to be persuasive on the issue, but merely be worthy of the jury's consideration because it calls to their attention a fact that raises a possibility that is not completely unreasonable." *Fugate v. Safeway Stores, Inc.*, 135 Or App 168, 173, 897 P2d 328 (1995).

We agree with defendant that the challenged evidence was relevant. Defendant's theory of the case was that he stabbed Salomon in the back in self-defense while Salomon had the defendant in a choke-hold. Defendant offered an expert witness, Knowles, and Exhibits 515 and 516, which Knowles generated, to demonstrate that defendant's account was physically possible. The state's position was that defendant's version of events was inconsistent with human anatomy. To persuade the jury of that point, the state sought to discredit Knowles by attacking his reputation and by showing that he was able to produce Exhibits 515 and 516 only by turning off Poser's anatomical-limits setting. The state asserted that those actions were deceptive and produced results that could not be trusted.

Defendant sought to rebut those assertions by introducing evidence that Poser's anatomical-limitations setting was *more* restrictive than actual human anatomy. That evidence would have been probative of at least two things. First, it tended to rebut the state's contention that Exhibits 515 and 516, which depict defendant's version of the fatal stabbing, were unreliable simply because Poser's anatomical limitations had been turned off. Second, it had a tendency to rehabilitate the credibility of Knowles by enabling the jury to conclude, contrary to Dovci's assertion, that Knowles had a legitimate reason to turn off the setting. That probative value of the evidence is not undermined by the fact that the images depict an act different than the act of which defendant was accused, as the trial court appears to have reasoned. In short, we conclude that defendant's excluded images were relevant and that the trial court erred in excluding them.

Evidentiary errors, however, are not presumed to be prejudicial. OEC 103(1). Accordingly, we may not reverse a defendant's conviction due to evidentiary error unless the

defendant can demonstrate that he or she was prejudiced by that error, *i.e.*, that the error was not "harmless." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In reviewing whether the erroneous exclusion of evidence was harmless, we assess the excluded evidence "in light of other evidence in the record pertaining to that issue." *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009). If evidence excluded in error "relates to a 'central factual issue'" it is "more likely to have affected the trier of fact's determination than if it deals with a tangential issue." *State v. Richards*, 263 Or App 280, 282-83, 328 P3d 710 (2014) (quoting *State v. Marrington*, 335 Or 555, 566, 73 P3d 911 (2003)). However, "if the particular issue to which the error pertains has little relationship to the issues being determined by the trier of fact, then there is less likelihood that the error affected the verdict." *Id.* Moreover, evidence is cumulative when it "demonstrates the same thing as other admitted evidence" but is not cumulative "when it presents qualitatively different proof than other admitted evidence." *State v. Bradley*, 253 Or App 277, 285, 290 P3d 827 (2012).

We conclude that defendant has met his burden of proving that the trial court's error in excluding relevant evidence was not harmless. Defendant raised a theory of self-defense that turned on his explanation of how the stabbing physically occurred: Knowles's testimony and Exhibits 515 and 516 were central to that defense. Thus, evidence that would have tended to affect the jury's assessment of the reliability of that evidence was important. The state's response to that evidence further reflects the centrality of that issue to this case. The state asserted that defendant's account of the stabbing was not anatomically plausible, and that defendant had "design[ed] fabricated evidence to try to fool the jury." The state's attack on Knowles's credibility was also a focal point of the state's closing argument, as referenced above. The excluded evidence thus went to the heart of defendant's theory of the case by tending to rebut the state's argument that defendant's account was implausible and that his expert was unreliable. *See Davis*, 336 Or at 34 (concluding that erroneously excluded evidence that "goes directly to the heart of defendant's factual theory of the case" likely affected the verdict).

We also reject the state's contention that the excluded evidence was cumulative of other evidence offered to prove that Poser's anatomical limits were overly restrictive. The excluded evidence was qualitatively different because it went directly to the question of Knowles's credibility. If the jury saw Poser images depicting human physical actions that the jurors believed were possible, and if the jury believed that Poser's anatomical limits had to be disabled in order to generate those images, that would affect the jury's evaluation of the state's contention that Knowles acted deceptively in disabling those limits.

In sum, we conclude that the evidence excluded by the trial court was relevant and should have been admitted. We further conclude that the evidence, if credited by the jury, would have tended to support defendant's theory of self-defense as well as rehabilitate defendant's expert witness. Accordingly, the trial court's error was not harmless and requires reversal and remand.

Reversed and remanded.