Argued and submitted March 16, 2015, reversed and remanded March 8, petition for review allowed August 3, 2017 (361 Or 800) See later issue Oregon Reports

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRIAN DANIEL BEMENT,
*Defendant-Appellant.*

Washington County Circuit Court
C100622CR; A152702

391 P3d 838

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services. Brian Daniel Bement filed the supplemental brief *pro se.*

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

**FLYNN, J.**

This appeal arises from defendant's conviction for aggravated murder. Defendant did not deny shooting the victim but contended that he acted in self-defense after the victim attempted to rob defendant at gunpoint. The jury rejected defendant's claim of self-defense and found defendant guilty of one count of aggravated murder, two counts of the lesser included charge of murder, two counts of first-degree robbery, and one count of felon in possession of a firearm.[1] On appeal, defendant raises 14 assignments of error, including nine that challenge the trial court's exclusion of statements from email messages written by the victim, G. Defendant offered those statements to support his theory that G grew progressively more paranoid about his financial solvency in the months before the shooting, culminating in a mental state that motivated him to demand defendant's money at gunpoint. We conclude that the statements are relevant and not subject to exclusion under the hearsay rules and, thus, that the court erred in excluding the statements. We also conclude that the error requires reversal because the excluded statements are qualitatively different from, and not "merely cumulative" of, other admitted evidence regarding G's mental state. Accordingly, we reverse and remand.[2]

## I.  BACKGROUND

Because our decision turns on the relevance of the excluded email statements and on defendant's need for those statements, we discuss the evidence presented at trial in significant detail. This case began after a Washington County Sheriff's deputy discovered a dead man slumped over in the driver's seat of a car that was parked in a cemetery west of Portland. The decedent, G, had suffered three gunshot wounds to the head, and a gun was lying on the rear passenger-side floor. The shots appeared to have been fired when the gun was very close to the body, perhaps one to six inches away.

---

[1] The court merged the verdicts on the murder counts with the verdict for aggravated murder and merged the verdicts on the two robbery counts.

[2] Given our disposition, we do not reach defendant's remaining assignments of error in his opening and *pro se* supplemental briefs. Among the assignments of error that we do not reach is defendant's challenge to the trial court's imposition of $674,892.87 in court-appointed attorney fees without evidence that defendant may have the ability to pay those fees, a ruling that the state concedes is error.

At first glance, the scene had the appearance of a suicide, given the location of the car, the position of the decedent's body, and the fact that the gun was left behind. However, the deputies quickly dismissed the possibility of suicide, in part because they concluded that the gun had been "wiped clean." In addition, deputies found a fourth bullet casing and a hole in the back seat upholstery. A state's expert testified that the trajectory of the hole suggested that the fourth shot was fired by someone sitting in the back seat.

Suspicion for the murder quickly turned to defendant when a friend of G's told detectives that G and a man that G introduced as "Frankie" drove off together from G's home in Portland on the day of the shooting. The friend provided a phone number for "Frankie," which the detectives traced to defendant.

Defendant was a drug dealer who purchased heroin in bulk and then repackaged it for street-level sales by "runners" who worked for defendant. He sometimes went by "Frankie." G was a naturopathic physician with his own practice, but he was also an investor in defendant's drug operation. He provided defendant with money to purchase the drugs that defendant then resold. The state's theory of the case was that defendant's relationship with G was going sour; that G and defendant had gone to the cemetery together with approximately $20,000 in cash supplied by G, for what defendant said would be a drug deal; but that defendant had planned, instead, to rob and shoot G and make the death look like a suicide.

In his testimony at trial, defendant admitted that he shot G, wiped the gun clean, took the money, and fled. Defendant claimed, however, that the money was his, that G had pulled the gun on defendant and demanded the money, and that, in an ensuing struggle for the gun, defendant shot G in self-defense.

A. *The State's Case*

The indictment alleged that defendant killed G in the course of a robbery. It charged him with two counts of robbery in the first degree and three counts of aggravated murder—based on separate theories of why defendant caused

the death of G: (1) in furtherance of the crime; (2) in an effort to conceal the crime; and (3) in an effort to conceal the identity of the perpetrator of the crime. The indictment also charged defendant with one count of being a felon in possession of a firearm.

The state presented evidence at trial that defendant owed money to G and that G was pressuring defendant to repay it. G expressed concern to Whitaker, an acquaintance in the drug business and a close friend, that defendant was not paying G money that he was owed. Whitaker believed that the debt that G was discussing was "a large amount of money," possibly higher than $300,000. In January 2010, G flew Whittaker to Portland to help G confront defendant about the money. Whitaker attended this meeting and thought that it went well, but he was not sure if they reached an agreement on when defendant would repay G.

However, Whitaker attended a second meeting between defendant and G a few weeks later and thought that defendant seemed "upset" about Whitaker's presence at the meeting. Defendant agreed that he owed G money but, rather than repay everything he owed to G, defendant thought that he should use the money to invest in a new operation in Costa Rica. Over the course of the next month, Whitaker had the impression that the relationship between defendant and G was getting worse.

The state's case also included evidence that defendant planned in advance to shoot G, to take the money, and to make the shooting look like a suicide. Heikkila was the friend who reported meeting "Frankie" at G's house on the morning of the shooting. That morning, defendant, Heikkila, and G spent time in G's bedroom where they shared a methamphetamine pipe and used heroin. Heikkila heard G and defendant discussing a planned drug deal. It was Heikkila's impression that defendant was trying to talk G into the drug deal and that G was reluctant to spend the money. At one point, G retrieved his pistol from a gun case, and Heikkila saw defendant place the gun in his waistband.

Later, Heikkila saw defendant loading boxes into the trunk and back seat of G's rental car. He saw G direct defendant to remove a FedEx box from G's safe and saw

defendant place that box in the trunk of G's car. While defendant and Heikkila were at the car, away from G, defendant told Heikkila, "I'm really worried about [G] lately. You know, things are falling apart and I think if this deal goes wrong, he's probably going to commit suicide." Eventually, defendant and G drove away in G's car, with defendant at the wheel because G "was in no condition to drive." Heikkila tried to find and follow the car, because he was concerned about G's safety.

As defendant and G headed west from Portland, they stopped to eat at a fast-food establishment, where they were captured on surveillance video. One of the videos showed defendant touching his belt line near his hip. A detective testified that "frequently," when officers see that move "on the street," it indicates that the person is concealing a weapon in his waistband.

A neighbor saw the car at the cemetery at 4:00 p.m., Heikkila and G had a five-minute phone conversation that ended at approximately 4:23 p.m., and two witnesses heard gunshots at about 4:30 p.m. After the shooting, defendant got a ride from O'Reilly, a woman with whom he had spent the prior evening.

O'Reilly testified that she had called defendant "around [3:00 p.m.]" to discuss a plan to get together, and that defendant had asked her to pick him up later in Hillsboro. O'Reilly met defendant in a parking lot and observed that he "was acting very strange" and was carrying a pink and white blanket. As they drove toward Portland, defendant told O'Reilly that "something had just gone wrong" and that he had shot G three times in the face at the cemetery. When she asked defendant if he was worried about getting caught, defendant told O'Reilly that he had been wearing gloves, "just in case," and that he had made the shooting look like a suicide. Defendant asked O'Reilly to be his alibi—to make up a story about having seen G drive away without defendant in the car. O'Reilly thought that defendant was just making up a story to impress her.

When they stopped at a gas station, defendant stowed in the trunk of O'Reilly's car the hoodie that he had been wearing along with the blanket, which had something

bundled inside of it. O'Reilly then drove defendant to the home of Harper, who worked for defendant in the drug distribution operation. Defendant brought in "a large amount of cash" covered with a blanket and Harper helped him count it.

In anticipation of defendant's claim that G pointed the gun first, the state also introduced evidence that G was a peaceful person. Even when high on methamphetamine, he was not aggressive or violent.

The state also presented evidence that the $20,000 that defendant took away from the shooting belonged to G, because—as the prosecutor told the jury—unless the jury found that the money belonged to G, "the robbery charges go away, the aggravated murder charges go away and the case is over." First, Heikkila testified that, the day before the shooting, he had accompanied G to two banks, and at each bank G withdrew $5,000, for a total of $10,000. Heikkila also testified that, while the men were in G's bedroom together, he heard defendant and G discussing $10,000 that defendant said he had placed in an envelope in G's safe, but that when G opened the envelope, there was "blank paper or funny money" in it.

Next, the state relied on a series of text messages that defendant sent to G in the days leading up to the shooting. In those messages, defendant repeatedly told G that he needed $20,000 to buy a kilo of heroin that defendant would be able to quickly resell for $30,000.

Finally, Harper testified that, when defendant arrived with the money, defendant said that he had stolen the money from G. Harper didn't remember if defendant used the word "rob," but the "general gist of what" defendant said was that "he had stolen it and taken it."

B.   *Defendant's Case for Self-Defense*

Defendant testified in his own defense and offered more benign explanations for his seemingly incriminating actions and statements. He agreed that he owed G money but described it as a small amount. One witness who overheard G discussing the debt with defendant overheard conversations in which defendant promised to repay the money

that he owed to G. That witness's impression was that the debt was in the range of several thousand dollars.

Defendant testified that the $20,000 he asked about in the text messages referred to mixed bills that he had given G to "launder" into larger bills that would be more suitable for a drug deal. Their system was that defendant would put money in a FedEx box that was kept in G's safe, and then G would put the laundered money back in the safe, in another FedEx box. Some of the text messages from defendant to G refer to defendant placing cash in G's safe. For example, on March 7, defendant sent G the following message: "I want to start dropping off cash in your safe. Is there a reason I can't come over tomorrow night, please?" And on March 10, defendant sent G another message: "I need to meet up, put cash in your safe * * *. Why are you blowing me off?"

Defendant was convinced that G was ignoring his texts, so the morning of March 13, defendant went to G's house and "banged" on the door until G let him in. Defendant testified that he had been planning on retrieving the money from G's house and then getting a ride to the drug deal, but that G was insistent on going along.

Defendant agreed that he took G's gun along, but he testified that he usually carried G's gun while transporting money. Harper's testimony confirmed that G frequently lent defendant the gun to use for protection. Defendant testified that he removed the gun from his waistband and placed it in the car, between the seats, so that he could carry the boxes that he was loading into the car. He explained that, when the surveillance video captured him touching his waistband, he was most likely tugging at a bandage wrapping that was holding gauze in place over a surgery site on his buttock. Defendant called as a witness his significant other to corroborate that defendant had undergone surgery to address two abscesses on his buttock, that she helped him bandage the wound with gauze and tape that reached around to defendant's hip, that he had trouble with the tape coming loose, and that he was still wearing the bandages on the day of the shooting.

Defendant testified that, on the way to the drug deal, G told him that he had forgotten to launder the money.

Defendant responded that they would need to park and count the money and G suggested a cemetery past which they had just driven. At the cemetery, defendant moved to the back seat to count the money, and G moved to the driver's seat. While defendant counted the money into stacks of $5,000, G had his phone conversation with Heikkila. At the end of the conversation, G told defendant that Heikkila was following them.

Defendant testified that he was upset that "some weird dude" that he didn't even know was following them and was annoyed that G had failed to launder the money, so he began arguing with G. Ultimately, defendant told G that he was "fucking done" with doing deals with G. He then looked up from counting the money to see that G had turned toward him and was pointing the gun at him, and G said, "Give me the fucking money." Defendant reached for the gun and forced G's hand down, at which point the gun went off. The gun dropped to the floor, and both men tried to get to it, but defendant grabbed the gun first and fired three shots. Defendant provided expert testimony that the bullet trajectories indicated that G's head was moving as the shots were fired and that nothing about the trajectory of the bullet in the seat indicated whether it was fired by a person sitting in the back or front seat.

Defendant emphasized that his statements to O'Reilly were consistent with the description of the shooting that he gave at trial. O'Reilly testified that, on her way to meet up with defendant, she called to tell him that she had gotten lost and that defendant sounded "frantic." Then, when defendant first told O'Reilly about the shooting, he said that G "was going crazy and—and that he took the gun from him and shot him three times in the face."

Defendant insisted that he never told Harper that he had robbed G, but, rather, that he described the shooting after G pointed the gun and then said that he "took the money and ran." Harper acknowledged on cross-examination that, although he had the impression that defendant had robbed G, he did not recall if defendant told him that. Harper also acknowledged that, in an earlier interview, he had "probably" told the police that defendant simply agreed

with Harper's question: "So, you just took [the money] and ran?"

Defendant emphasized that Harper described the money that they counted as consisting of stacks of ones, fives, and tens—consistent with the denominations received through street sales. Indeed, Harper had estimated that the cash included approximately $6,000 in five-dollar bills and at least a thousand one-dollar bills. Defense counsel argued that the mix of bill denominations meant this was defendant's money rather than G's, because G would not have withdrawn money in those denominations.

However, as defense counsel acknowledged in opening statement, G was a "well-respected" naturopathic doctor, father of "two wonderful kids," and owner of what had been a successful business. To explain why someone of G's stature would become, as defense counsel told the jury, "a man who felt like his only option was * * * to point a loaded gun at [defendant's] face and try and take the money," defendant sought to portray G as a man who was distressed about financial losses and was becoming "increasingly more paranoid," driven in part by heavy drug use. For example, defendant introduced evidence that G's business had downsized dramatically over the course of a few years, reaching the point that a business broker in late 2009 estimated that G's business was valuable only for its physical assets and was worth as little as $35,000. The jury also heard that G became convinced that somebody was embezzling from his practice, that he was "very preoccupied" with finding out who was stealing from him, and that "it got worse." A few weeks before the shooting, G's employees arrived at work and found that G had changed the locks, a step that one employee described as "seemingly paranoid."

In addition, witnesses described G as having a negative attitude toward defendant. Whitaker testified that G initially wanted to aggressively confront defendant about his debt to G, including using violence if defendant did not respond appropriately, but that Whittaker convinced G to take a more restrained approach. A witness who had overheard telephone conversations between G and defendant testified that G was becoming more preoccupied and concerned

because he thought that defendant ultimately would not pay the money that he owed G. G also told Whittaker that he suspected defendant of being responsible for G's losses in the business.

As evidence of G's mental state at the time of the shooting, defendant offered expert testimony that G was basically a "constant" user of meth by February 2010, and that the level of methamphetamine in G's blood at the time of death was higher than the threshold levels that are associated with drug-induced violence and irrational behaviors. Defendant also elicited testimony that Heikkila suggested that G should be concerned about G's plans on the day of the shooting, telling G before he left for the drug deal, "Whatever you do, * * * you should get the gun[.]"

In addition to the witness testimony, a significant part of defendant's proof of G's mental state relied upon G's own words in 11 emails that G sent defendant between November 2009 and March 2010. The offered emails described G's business and personal financial difficulties, his activities related to those difficulties, and his concerns about the extent of those difficulties. Later emails also describe G's belief that his employees were stealing from him.

## II. THE EMAIL DISPUTE

Defendant moved *in limine* to admit the email statements. He argued that the emails were relevant as circumstantial evidence of G's state of mind—that he believed he was bankrupt and was "paranoid, frustrated, and desperate over the perceived thefts"—and, consequently, that the statements were "probative of [G's] motive for pulling a gun on [defendant] on March 13, 2010." Defendant also argued that the emails would be probative of G's state of mind regardless of whether the financial details were true and, thus, that the emails should be admitted either as nonhearsay or as hearsay subject to the exception in OEC 803(3). The state objected that the emails were inadmissible hearsay and also not relevant.

The court announced an initial impression that some of the statements, "if they're correctly tailored, are

going to come in under [defendant's] theory" and would not be "too prejudicial." The parties agreed, however, that the court needed an opportunity to review the specific statements that defendant was seeking to admit in the various emails and to consider the admissibility of each statement individually.

Ultimately, the court admitted some of the statements in emails that G sent in February 2010, and admitted in full the statements that defendant offered from emails dated February 5, 2010, and March 5, 2010. Most of the admitted statements describe G's distress about perceived theft by his employees and the effect of that theft on G's business.

"[Sent February 13, 2010:] I am sorry to say that the crime that has been committed here in my office only mushrooms. I am amazed that out of 12 or so people I've checked on, only one has not faked payments, created credit memos for themselves, discounted payments to [patients] maybe without them knowing and pocketed some money. It is utterly heinous and that magnitude is staggering. I've gone back six years and found hanky-panky way back there."

"[Sent February 15, 2010:] We are talking well over a $100k and probably near or over 200k. It is the most horrible, despicable, heinous conspiracy I could imagine. It would have been completely beyond my imagination except that it's all true and I've got numerous ways to prove it. I just looked at the $150 [C] stole with a credit card refund, plus the products. They don't realize I know and I am watching them. I wanted to watch [J] for a bit, but I've had enough."

"[Sent February 20, 2010:] [T]hese 'core 4' employees and numerous other shorter people, admin staff, grunts, doctors with ONLY ONE EXCEPTION have all been stealing and embezzling to a degree that should have put me out of biz some time ago. * * * [T]hese motherfuckers will pay dearly, including punitive damages such that they will never forget they crossed me."

"[Sent February 26, 2010:] Everywhere we look there are strange bookkeeping practices in play. It's very discouraging. [Some] recommend to cut my losses and just look forward. The losses are immense, however, and they are complex."

"[Sent March 5, 2010:]   In the past 4 weeks I have discovered that most of the employees I've had over the past 5 years have stolen money and products from my office in collusion with each other and with planned, intentional deceit that I still don't totally understand. It has probably cost me $200,000 on a conservative side between all the various and malicious acts that have continued, even after the *worst perpetrator was released in January*. I have been upset and obsessed to find out who did what for how long, how they deceived me and I am disheartened to find that their schemes just keep getting more grandiose and more costly * * *.

"I am sorry, but I was on the phone with a company that COULD help me if they cared. I also visited with accountants and attorneys this week and the overriding consensus was: EAT IT, SON. No, I won't. That is too big, too fraudulent and too deceitful, too illegal for me to do so. Yesterday was a transition point where I realized the course I thought would work actually told me that it is essentially my problem (and my fault) and that they would not engage in helping me. That was REALLY upsetting."

A handful of admitted statements expressed concern about G's personal financial solvency:

"[Sent February 2, 2010:]   I started telling you over a year ago, I'm in a major pinch & can only pay for essentials."

"[Sent February 5, 2010:]   I have incurred a 75 percent reduction in income since 2008 and am no longer able to budget for [a contribution to tuition]."

"[Sent February 15, 2010:]   It totally sucks and I am drowning in debt."

"[Sent February 20, 2010:]   Meanwhile, I'm nearly bankrupt personally and in biz bcz my income is down over 75 %."

"[Sent March 5, 2010:]   [M]y own financial solvency is only being supported by the credit I have developed and the equity in my house."

The court, however, excluded all of the statements in four emails that G sent between November 29, 2009, and January 6, 2010, explaining that they were not "terribly relevant given" that the shooting occurred months later. The

court also excluded statements in other emails on the basis that they were "not really a state of mind" or statements "about facts or what he's planning on doing." Defendant challenges those rulings on appeal.

## III. ANALYSIS

Defendant renews his argument that all of the proffered email statements were relevant to show that G's state of mind regarding his perceived financial distress gave him a motive to rob defendant. He also argues that those statements are not hearsay or, if hearsay, are admissible under OEC 803(3) as statements of G's "then existing state of mind." The state primarily argues that the statements are not relevant to G's state of mind and also that the court permissibly exercised its discretion to exclude the statements under OEC 403.

### A. *Relevance*

We begin by evaluating whether the excluded statements are relevant, because that is the primary point of dispute on appeal. Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. That test sets a "very low" threshold for admissibility: "[A]s long as the evidence, based on logic and experience, can support a reasonable inference that is material to the case, then the evidence is sufficiently relevant to be admissible, even if that is not the only inference that the evidence would support." *State v. Turnidge (S059156)*, 359 Or 507, 512-13, 373 P3d 138, *cert den*, ___ US ___, 137 S Ct 579 (2016). We review a trial court's determination of relevance under OEC 401 for errors of law. *State v. Voits*, 186 Or App 643, 654, 64 P3d 1156, *rev den*, 336 Or 17 (2003), *cert den*, 541 US 908 (2004).

As set out above, defendant offered the emails to show G's state of mind at the time of the shooting. We have specifically emphasized that "[r]elevant evidence can include evidence relating to a crime victim's state of mind or future intentions." *Voits*, 186 Or App at 653. The state argues, however, that all of the excluded email statements are irrelevant, either because they describe factual details that cannot be

relevant to G's state of mind or because the statements are too old to be relevant to G's state of mind at the time of the shooting. We disagree with both propositions.

### 1. *Background detail relevant to state of mind*

The trial court considered some of the email statements to be "too factual" to be admissible, and the state argues that the factual statements were not relevant to G's state of mind. According to the state, "statements regarding isolated elements of an individual's finances cannot support any inference about that person's perception of his financial condition and are therefore irrelevant to that state of mind." The state's argument is essentially the same argument that we rejected in *Voits*, 186 Or App at 655. In *Voits*, we considered the relevance of 42 letters written by the crime victim, the defendant's wife, which the trial court had admitted at trial. *Id.* at 652. The state had offered the statements in the letters to rebut the defendant's theory that the victim had committed suicide and to rebut the defendant's evidence and argument that he had no motive to kill the victim, because the victim had abandoned her plans to dissolve their marriage. *Id.* at 654. The letters, the state argued, showed the victim's positive state of mind and that she was looking forward to a future without the defendant. *Id.* The defendant contended, as we understood his argument, that there was no relevance to statements that were "contextual and background information about the victim's life." *Id.* at 655.

We disagreed with the argument of the opponent of the evidence in *Voits*, and explained that, although "contextual material" may have "limited, if any, *independent* relevance to an issue in [a] case," the evidence is nevertheless relevant to provide factual context for other statements by the victim about her state of mind or future intentions. *Id.* at 655 (emphasis in original). We also explained that, "[w]here evidence of the victim's state of mind or future intentions is relevant to one or more issues in the case, that evidence may be either direct or circumstantial." *Id.* at 654 (citing *State v. Clegg*, 332 Or 432, 441, 31 P3d 408 (2001)). We concluded that all of the challenged evidence was relevant, either because the statements were "core declarations

\* \* \* establish[ing the victim's] positive state of mind about the future and her intention to proceed with the dissolution of her marriage," or because, as contextual and background information, the statements assisted in establishing the relevance of the victim's declarations of her state of mind. *Voits*, 186 Or App at 655-56.

As in *Voits*, all of the statements at issue here satisfied the minimal standard for relevance, either as direct or circumstantial evidence that G was concerned about his finances, or as context for the statements that are independently relevant to G's state of mind. For example, the statements that defendant sought to admit from G's November 29, 2009, email to his ex-partner, and mother of his children, contain a representative mix of statements suggesting that G was concerned about financial solvency, along with statements of factual details that provide context for those statements of concern:

> "Lastly, I understand that you want me to get you 10k. Unfortunately, all the events of dissolving our relationship, paying numerous large bills at the end of the summer, becoming unable to work and now having a large medical bill that is not covered by insurance plus the fact that my practice is down another 33% makes it questionable as to whether I might need to liquidate my gold just to stay solvent. The interest alone on the bills I have is going to be more than I can afford. I've taken a total of $9000 GROSS pay in the last 4 months."

To the extent that some of the statements are contextual or background information about G's life—possibly the list of bills and statement of income—those statements are relevant because they provide factual context for the other statements that are evidence of his state of mind regarding financial solvency at the time he made each statement. *See Voits*, 186 Or App at 655. And that evidence of his concern and desperation progressing over time has some tendency to make it more likely, as defendant argues, that G "had the motive to act desperately and violently to get money from [defendant]."

We reach the same conclusion with regard to the three excluded emails from December 2009 and January

2010, which show G's concern about money. The excluded portion of the December 23, 2009, email, which G sent to some of his employees, includes numerous statements from which it can be inferred that G was becoming more distressed about his financial circumstances:

"The trend has accelerated * * *[.] I must say I assumed I was still living with an income that was something I could live on and now I realize that this entire year I've been shaving my salary and eliminating my distributions to try to stay solvent. That 9k could wipe me out very quickly[.]

"* * * [T]here were signs of that being a shortcoming of income from the early part of 2009. * * * Bottom line, we were in a negative balance (roughly 2.5k) in each of the first 2 qtrs- so we've been at a deficit all year, and it is highly likely that the 3rd qtr was even more to the neg but I don't recall right now.

"Now, I'm not asking for your pity but * * * it is no longer paying me anything close to what I need to live on.

"This is a huge decision to walk away, even though I might not have a choice[.]

"I have spent several hours today researching different types of bankruptcy and how they might affect me/us.

"* * * Dec is a short work month so I am expecting the remaining amount (6k) in saving will need to be drawn on to pay bills."

The email that G sent January 1, 2010, to his ex-partner is, similarly, circumstantial evidence of G's belief that his financial situation was bad and worsening: "[F]or what it's worth, yes, I have begun liquidating my gold. That happens before the IRAs." The statement indicates that G believed his situation had become more desperate than it was in the November 29, 2009, email when he believed it was "questionable as to whether" he "might need to liquidate [his] gold just to stay solvent."

The excluded statements from G's January 6, 2010, email include more statements indicating growing concern for his financial plight or providing context for those statements of concern: "I am personally liable for all pers and biz debt and, at the moment, and both places are amounting

to roughly, with variances, to $11,000/month. The last 3 months it has accelerated"; "It looks like I'll need to sell my house if I don't create income by spring"; and "Now, the buffer is completely gone and I've covered bills through 15th an[d] I must work immediately to cut expenses." In short, the excluded email statements from November 2009 through January 2010 were relevant, as in *Voits*, as direct or indirect evidence of G's state of mind regarding his finances, or to provide context for his statements regarding his state of mind.

Finally, we reject the state's contention that the statements excluded from the February 2010 emails are not relevant.[3] The excluded portions of the February emails are relevant for the same reasons that the earlier emails were relevant. Some of the excluded statements are independently relevant as direct or circumstantial evidence of G's state of mind, suggesting that his concern about financial insolvency progressed to a belief that his financial struggles were due to widespread employee theft, *e.g.,* "I am still very much underwater $ly [sic] * * *. It's horrible but I am determined to examine every transaction and see what they've done"; and "This month I'll need every dollar I can get." The other excluded statements are relevant as factual context for the statements in those emails that indicate G's state of mind—many of which the court admitted. The court erred in concluding that any of the emails were "too factual" to be relevant.

### 2. *"Remote" evidence of state of mind*

The court also appears to have concluded that the first four emails are too remote to be relevant, and the state urges us to accept that determination. Under the circumstances of this case, we disagree. Although the state is correct that the earlier statements are admissible as evidence of G's state of mind at the time that he made those statements, and that defendant ultimately sought to prove G's state of mind at the time of the shooting, that does not make

---

[3] The state correctly points out that defendant's fifth assignment of error challenges the redaction of an email dated February 2, 2010, which the trial court actually admitted in its entirety. Accordingly, we reject defendant's fifth assignment of error without further discussion.

the earlier statements irrelevant. As defendant argues, those statements are evidence that "G had spent the last several months of his life believing that his financial straits were growing more and more dire," culminating in the state of mind evidence on February 26, 2010, that he would "need every dollar [he could] get." That evidence has a tendency to make it more probable that G reached a state of mind on March 13, 2010, that provided a "motive to act desperately and violently to get money from [defendant]." Thus, we agree that all of the emails, including those sent from November through January, are relevant to G's state of mind at the time of the statements, which, in turn, is probative of G's state of mind at the time of the shooting.

## B. *Hearsay and the OEC 803(3) Exception*

Defendant also argues that the trial court erred in concluding that the email statements should be excluded as hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). The general rule that hearsay is inadmissible is subject to many exceptions, including the exception for statements "of the declarant's then existing state of mind[.]" OEC 803(3).

Defendant argues that the email statements are not hearsay because he sought to introduce them "to show [G's] *perception* of his financial health and his employee's actions, *not to prove that those perceptions were true*." (Emphasis in original.) In the alternative, he argues that they are admissible under OEC 803(3) as evidence of G's state of mind. The state responds that the statements are hearsay, relying on *State v. Causey*, 265 Or App 151, 333 P3d 345 (2014), in which we held that text messages from the defendant constituted hearsay, because the state offered them only as circumstantial evidence of alleged prostitution activities and, we explained, "to be relevant as circumstantial evidence, *** the jury was required to accept the truthfulness of the content of those messages." *Id.* at 154-55.

Ultimately, however, the hearsay dispute does not determine whether the statements are admissible. As the state acknowledges, to the extent that any of the excluded

email statements are considered hearsay, they are, nevertheless, admissible under OEC 803(3) if they are relevant to G's state of mind. Although the state insists that the statements are *not* relevant to G's state of mind, and thus, *not* admissible under OEC 803(3), we have already explained that the excluded statements are relevant to that very issue.

The statements are relevant either as direct or circumstantial declarations of G's state of mind or as contextual and background information to aid in understanding direct or circumstantial declarations of G's state of mind. Those statements that are either direct or circumstantial evidence of G's state of mind constitute assertions of his state of mind for purposes of the OEC 803(3) exception. *See Voits*, 186 Or App at 658 ("The Supreme Court has explained that statements that constitute circumstantial evidence of the declarant's state of mind, as well as statements directly addressing the declarant's state of mind, are hearsay assertions admissible under OEC 803(3)." (Citing *Clegg*, 332 Or at 441.)). And those statements that merely provided context or background for G's declarations regarding his state of mind are not hearsay. *See Voits*, 186 Or App at 658 ("much of the contextual or 'background' material, * * * although * * * relevant as an aid to understanding, * * * constituted neither direct nor circumstantial evidence of the victim's state of mind * * * and therefore was not offered to prove the truth of the matters asserted"). Either way, the trial court erred in excluding the statements as hearsay. *See Voits*, 186 Or App at 658 (citing Laird C. Kirkpatrick, *Oregon Evidence* § 803.03(3)(a), Art VIII-77 (4th ed 2002), as "noting that authorities have been divided as to whether statements that constitute circumstantial rather than direct evidence of state of mind are hearsay; [but] that the issue has little practical significance because, even if hearsay, such statements are nonetheless admissible under the state-of-mind exception" (internal quotation marks omitted; parentheses omitted)).

C. *OEC 403 Balancing*

Although, as we have concluded, the email statements are relevant and not subject to exclusion as hearsay, the state urges us to conclude that the trial court excluded at

least some of the emails under OEC 403 and to affirm that exclusion as an exercise of discretion. The state points both to the court's comment that it did not "think [the first four emails] were terribly relevant given their—how they're in November and in January of 20[10] and Dr. G didn't—didn't die until March of 2010," and to its comment that "there's a relevance balancing I'm doing here."

The state is correct that both comments could reflect an exercise of the court's discretion under OEC 403 to exclude relevant evidence "if its probative value is substantively outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." OEC 403. We explained in *State v Robinson*, 104 Or App 613, 802 P2d 688 (1990), that "'[r]emoteness' is a term that has not expressly been incorporated into OEC 403; however, the rule provides the correct analysis for determining whether such evidence is admissible." *Id.* at 616 n 2 (citing Kirkpatrick, *Oregon Evidence* § 126 (2d ed 1989)).

Defendant emphasizes, however, that the state never asked the court to exclude the emails under OEC 403, and the court never announced that it was excluding any emails under OEC 403. Moreover, the court's "relevance balancing" comment was made in the context of explaining a different ruling—a ruling not challenged on appeal—to exclude two statements that defendant offered to show why G withdrew $10,000 from his bank. The court excluded those statements because "we don't have all the bank records that would prove all this stuff." We are inclined to agree with defendant's assessment of the record. *See State v. Hudson*, 279 Or App 543, 553, 380 P3d 1025 (2016) (determining that, despite arguments that the trial court had excluded evidence under OEC 403, "the fairest reading [of the record] is that, in the trial court's view, the evidence lacked probative value. As noted, we review that conclusion for legal error.").

In any event, to the extent the court engaged in OEC 403 balancing regarding the exclusions that defendant challenges on appeal, the balancing was skewed by the court's erroneous assessment that the statements were not admissible under the hearsay rules, not relevant, or both.

We have concluded that the court was wrong on both points. Thus, the court "did not correctly consider the 'quantum of probative value of the evidence,'" which OEC 403 balancing requires. *State v. Baughman*, 276 Or App 754, 772, 369 P3d 423, *rev allowed*, 359 Or 847 (2016) (quoting *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987) (describing the method of analysis that a trial judge should follow in making a decision under OEC 403)). Because the trial court incorrectly assessed the probative value of the evidence, "the trial court did not properly conduct the required balancing under OEC 403," and we will not affirm the court's ruling as a proper exercise of its OEC 403 discretion. *Baughman*, 276 Or App at 772.

### D. *Likelihood that the Error Affected the Verdict*

Although we have concluded that the court erred in excluding the emails, "[e]vidential error is not presumed to be prejudicial" and only requires reversal when "a substantial right of the party is affected[.]" OEC 103(1). The Oregon Constitution, similarly, requires the court to affirm certain judgments, if "after consideration of all the matters thus submitted, * * * the judgment * * * was such as should have been rendered[,] * * * notwithstanding any error committed during the trial[.]" Or Const, Art VII (Amended), § 3. As the Supreme Court has explained, that constitutional test "consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). The inquiry is the same whether the error is in the admission or, as here, the exclusion of evidence. *State v. Perkins*, 221 Or App 136, 143-44, 188 P3d 482 (2008). The correct focus of the "little likelihood" inquiry "is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a fact-finder, would regard the evidence of guilt as substantial and compelling." *Davis*, 336 Or at 32.

Considerations that "may properly inform that 'single inquiry,' includ[e] 'the nature of the error that occurred below,' [*Davis*, 336 Or at 32], and the 'context of the legal error.' *Id.* at 33." *Perkins*, 221 Or App at 143. A contextual reason that evidentiary error might be harmless is if the improperly excluded evidence is "merely cumulative" and

not "qualitatively different" from admitted evidence. *State v. Blaylock*, 267 Or App 455, 472, 341 P3d 758 (2014), *rev den*, 357 Or 299 (2015) (citing *Davis*, 336 Or at 34; *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009)). However, even those considerations are circumscribed by the relative importance of the evidence to a central factual issue. "If erroneously admitted or excluded evidence relates to a 'central factual issue' in the case, it is more likely to have affected the trier of fact's determination than if it deals with a tangential issue." *State v. Richards*, 263 Or App 280, 283, 328 P3d 710 (2014) (citing *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009)). In assessing whether error in excluding the email evidence requires reversal, we will consider all pertinent evidence, not just evidence favorable to the state. *Blaylock*, 267 Or App at 456 n 1.

As an initial matter, we agree with defendant's argument that the excluded email evidence was relevant to a central factual issue of his case. Defendant's effort to convince the jury, as he describes it, "that a man who had the outward appearance of success might have grown so desperate that he would engage in violence in order to steal what once would have been, to him, a modest amount of money" was central—if not vital—to defendant's case.

The state does not specifically dispute that the excluded email statements were relevant to a central issue in the case, but it argues that the error does not require reversal because the excluded email statements were "merely cumulative" of "substantial evidence of the same nature" that defendant presented to the jury. The evidence to which the state points as qualitatively comparable includes the admitted emails, which the court allowed defendant to introduce as an exhibit and also to read to the jury, as well as a great deal of witness observations. According to the state, that admitted evidence "gave the jury plenty of reason to believe that [G] was unstable, paranoid, and financially desperate," and, indeed, the jury may have accepted that characterization yet still rejected defendant's version of the shooting.

Although defendant acknowledges that he was able to introduce other evidence relevant to G's distress about

his finances, he argues that the excluded email statements provide evidence in G's own words that he "had spent the last several months of his life believing that his financial straits were growing more and more dire," in a way that is not matched by the admitted evidence. We agree.

A jury could infer that the excluded email statements depict increasing desperation about his perceived financial straits, and that inference would come in part from seeing the historical progression of G's distress over time. Although we have set out the text of the emails above, we again set out some of the most significant of the excluded statements.

"[Sent November 29, 2009:]  Unfortunately, all the events of dissolving our relationship, paying numerous large bills at the end of the summer, becoming unable to work and now having a large medical bill that is not covered by insurance plus the fact that my practice is down another 33% makes it questionable as to whether I might need to liquidate my gold just to stay solvent. The interest alone on the bills I have is going to be more than I can afford."

"[Sent December 23, 2009:]  The trend has accelerated"; "we were in a negative balance (roughly 2.5k) in each of the first 2 qtrs- so we've been at a deficit all year, and it is highly likely that the 3rd qtr was even more to the neg but I don't recall right now"; and "I am gaining a sense of what is at stake here and what the implications will be to me with ANY choice I make."

"[Sent January 1, 2010:]  [F]or what it's worth, yes, I have begun liquidating my gold. That happens before the IRAs."

"[Sent January 6, 2010:]  The last 3 months it has accelerated. It looks like I'll need to sell my house if I don't create income by spring. * * * Now, the buffer is completely gone[.]"

"[Sent February 26, 2010:]  This month I'll need every dollar I can get."

We agree with defendant that the excluded emails were qualitatively different from both the admitted emails and the witness testimony. Although witnesses described G's statements and behavior in ways that would permit an inference that G's mental state had become as paranoid and desperate as defendant claimed it was, G's own words reveal

his state of mind in a way that is qualitatively different from the observations of outsiders or any other evidence offered by the state or defendant.

As defendant emphasizes, it appears that the jury's "decision in this case was a close one." The jury deliberated for a week before finding defendant guilty of aggravated murder on the first count and guilty of the lesser-included charge of murder on the other two aggravated-murder counts. G's mental state was likely a central factual issue that the jury considered in reaching its verdict, and the excluded statements tended to support defendant's theory regarding G's mental state in a way that the other evidence could not. We are, therefore, persuaded that there is more than a "little likelihood" that the error affected the verdict.

Reversed and remanded.